STATE OF CONNECTICUT v. PEDRO TORRES
(12442)

LAVERY, LANDAU and HENNESSY, Js.

Argued September 23, 1994—decision released January 3, 1995

*Jeffrey A. Jones,* with whom, on the brief, was *Elena M. Gervino,* for the appellant (defendant).

*Pamela S. Meotti,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Thomas E. Prior,* assistant state's attorney, for the appellee (state).

LAVERY, J. The defendant, Pedro Torres, appeals to this court from the judgment of conviction, after a jury trial, of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278, and conspiracy to distribute narcotics in violation of General Statutes §§ 21a-277 (a) and 53a-48 (a). The defendant claims (1) that the trial court improperly found that probable cause existed to issue a search warrant based solely on information from an informant after the court had excised two corroborating paragraphs from the warrant affidavits because it found that the police had conducted an unlawful surveillance of the defendant, and (2) that the

trial court improperly denied the defendant's motion to suppress evidence obtained during the warrantless search of the hallway. We affirm the judgment of the trial court.

As to the first claim, the following is set forth in the affidavits:[1] On January 9, 1992, a confidential infor-

[1] The two warrant affidavits are identical except for the apartment numbers. The body of the affidavit submitted is as follows: "That the affiants Detective Robert Kanaitis and Detective Richard Murzin are both members of the Hartford Police Department with thirty-two years of combined police experience. That both affiants have participated and conducted numerous narcotic investigations that have subsequently led to arrests and convictions. That both affiants have attended many in service and narcotic schools. That Detective Robert Kanaitis was a sworn member of the Connecticut Statewide Narcotics Task Force for a period of sixteen months, a division of the Connecticut State Police.

"(1) That on 01-09-92 the undersigned affiants received information from a most reliable confidential informant that a Dominican narcotic organization was actively dealing large quantities of heroin in the city of Hartford. That this informant who has been utilized as a confidential reliable informant for seventeen years and that his/her information has led to many large seizures, arrests and convictions. That this informant stated that large quantities of heroin was being kept and sold at two separate apartments located at 23 Marshall St. C-4 and C-7, Hartford, Connecticut. That the informant stated that he/she on 01/09/92 was at apartment C-7 with a Dominican male and observed the purchase of 100 yellow bags of heroin from a Hispanic male known as Pedro who is described as being 5'5" tall, 140 lbs., short black hair, light complexion. That during the sale of this heroin the informant observed 'Pedro' walk over to 23 Marshall Street C-4 Hartford, Connecticut, to get the heroin but left the money at 23 Marshall Street C-7 Hartford, Connecticut.

"(2) That on 01-13-92 the undersigned affiants met with Robert Lipman owner of 23 Marshall Street, Hartford, Connecticut, who stated that he provided information that the persons living at 23 Marshall Street C-4 according to the application is a Hispanic male known as Manuel Cruz DOB-10-10-56 and that the persons listed for 72 Marshall Street C-7 is a Hispanic female known as Lydia Gonzales DOB-10-29-55. That these parties are possibly Dominicans placed at this building by a Gloria Martinez of Hispania Realty. That several persons that were in the past placed at 23 and 27 Marshall Street, Hartford, by Gloria Martinez have been arrested as Dominican drug dealers by these affiants.

"(3) That the undersigned affiants with the approval of Robert Lipman disguised themselves as maintenance persons who were installing smoke alarms in the apartments for the purpose of an undercover purchase of

mant notified Detectives Robert Kanaitis and Richard Murzin of the Hartford police department that a

heroin from 23 Marshall Street apartments C-4 and C-7 Hartford, Connecticut. That both affiants knocked on the door of 23 Marshall Street C-7 and that a short male, Hispanic, 5'5", 140 lbs., short hair, mustache, light complexion responded. Both affiants told this person that we were from the maintenance office and that we would be installing smoke alarms. That upon entrance to this apartment both affiants observed a large quantity of US currency sitting on the table and two beepers sitting on the table, there were two Hispanic females in the apartment, a heavy set female quickly took all the money off the kitchen table and placed it in a gym bag. At this time these detectives installed a new battery in the existing smoke detector and at no time searched any items or opened any drawers or looked other than open view. At this time these affiants left the premises with no suspicion from the suspects.

"(4) That the undersigned affiants with the approval of Robert Lipman disguised themselves as maintenance workers and went to 23 Marshall Street C-4, Hartford, Connecticut, knocked on the door and again the same exact person who responded to 23 Marshall Street C-7 responded. He acted extremely nervous and again we stated that we were replacing the smoke alarm. That upon entrance it was noticed that this apartment had very little furniture. Detective Kanaitis noticed that the bathroom fan was opened and not functioning. At this time these affiants began to clean out the debris inside the fan motor and requested a plastic bag. The suspect known to these affiants as Pedro, took the kitchen basket bag and brought to these affiants who placed all debris into it. That at this time when these affiants looked into the surface of the garbage and noticed many empty boxes that normally contain 500 plastic sleeves that are commonly used to bag heroin, they also noticed many packages of empty scotch tape case and empty dispensers, many glassine bags, many small rubber bands normally used to bundle ten packs of heroin. That on the kitchen counter in open view both affiants observed a white plastic bottle marked 'lactose' and several empty glassine bags. This person known as Pedro was also in apartment C-4 with an unknown female who quickly placed the lactose in a kitchen cabinet. At the same time these affiants noticed that the intercom that was in the open area had two loose screws. Affiant Detective Murzin stated that it appeared that the intercom was defective. Pedro quickly stated, 'No it's fine.' He was extremely nervous. Detective Kanaitis stated, 'I will tighten the screws.' At this time both affiants left the apartment. At no time did the affiants search or look at any item that was not in the open or open any drawers or cabinets.

"(5) That based on the information provided on this application that is all accurate and truthful and that based on information and personal observation by these affiants that there is ample probable cause to show the court that narcotics are being kept for distribution at the locations noted on this application. These affiants request that this application be granted."

"Dominican narcotic organization was actively dealing large quantities of heroin in the city of Hartford." The informant, who had worked with the police for seventeen years and whose information had led to numerous seizures, arrests and convictions, stated that large quantities of heroin were being kept and sold from apartments C-4 and C-7 at 23 Marshall Street. The informant stated that he had observed "the purchase of 100 yellow bags of heroin from a Hispanic male known as Pedro [the defendant] who is described as being 5′5″ tall, 140 pounds, short black hair, light complexion." The sale occurred in apartment C-7, but the informant saw the defendant walk to apartment C-4 to retrieve the heroin.

Four days after the informant's call, the detectives met with Robert Lipman, the owner of 23 Marshall Street. They dressed as maintenance persons and, with Lipman's approval, conducted a surveillance of apartments C-4 and C-7. The detectives knocked on the door of C-7 and stated that they were from the maintenance office and were installing smoke alarms in the apartments. They were admitted by a short, Hispanic male, approximately 5 feet 5 inches tall and weighing 140 pounds, with short hair, a mustache and a light complexion, who was later identified as the defendant. The detectives observed a large amount of United States currency and two beepers. Two Hispanic women were in the apartment, one of whom quickly removed the money from the table and placed it in a gym bag. The detectives installed a new battery in the smoke alarm and left the premises.

The detectives then knocked on the door of C-4 and were admitted by the same man who had admitted them to C-7. He appeared to be nervous. The detectives noticed that the apartment had very little furniture. They began to clean debris from the bathroom

fan motor and requested a plastic bag for the debris. The defendant brought them the kitchen garbage bag, in which the officers observed many empty boxes of plastic sleeves, all commonly used to bag heroin, empty tape cases, glassine bags, and small rubber bands, commonly used to bundle ten packs of heroin. On the kitchen counter, in plain view, the detectives noticed a bottle marked "lactose" and several glassine bags. An unidentified woman quickly placed the lactose bottle in the kitchen cabinet. The detectives left after cleaning the fan and tightening loose screws in an intercom.

On the basis of the informant's tip and the corroborating evidence, the detectives sought and obtained search warrants for 23 Marshall Street, apartments C-4 and C-7. The warrants were issued on January 13, 1992, four days after the informant's tip and the same day that the detectives had entered the apartments. That evening, the detectives executed the search warrants and arrested the defendant and four other individuals.

From apartment C-4, the detectives seized two bags containing a total of 61.3 grams of heroin and 300 glassine bags containing a total 6.5 grams of heroin, each stamped with the word "MORTAL" and a skull. They also recovered a scale, a sifter, a pestle, a .38 caliber gun with five rounds of ammunition, an ink pad and a stamp with a skull and the word "MORTAL," tape, rubber bands, bags, boxes of empty bags and tape containers. A search of apartment C-7 yielded $13,800, two beepers and records of drug sales. Murzin testified that the heroin recovered in the search would be worth approximately $85,000 on the street.

The defendant filed a motion to suppress all evidence seized in the case, arguing that it was "obtained in violation of the defendant's rights under the fourth and fourteenth amendments to the United States consti-

tution and in violation of the defendant's rights under article first, § 7, of the Connecticut constitution." He then filed an amended motion to suppress all evidence seized under authority of the search warrants.

The defendant claimed that paragraphs three and four of the affidavits, which described the surveillance, should be excised from the affidavits because the search was unlawful. He argued that the remaining paragraphs would not support a finding of probable cause. In a second amended motion to suppress, the defendant sought an order barring testimony about the "police ruse," in the event that the court struck paragraphs three and four of the affidavits but concluded that the remainder supported a finding of probable cause.

The court found that the defendant had not consented to the search of C-4 or C-7 and that it was unlawful. The trial court considered the warrant affidavits "exclusive of paragraphs three and four." The court analyzed the remainder of the affidavits under article first, § 7, of the Connecticut constitution.[2]

In its oral memorandum of decision, the trial court found that "the facts stated in paragraphs one, two and five provided a substantial basis for the magistrate's conclusion that there was a fair probability that illegal drugs and proceeds of narcotic transactions would be found in the respective apartments on January 13, 1992." The trial court articulated the following reasons for its conclusion. First, the court noted that the affiants had described the confidential informant as "most reliable," that the informant had worked with the police for a period of seventeen years, and the informant's

_____

[2] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

information had led to many seizures, arrests and convictions. In addition, the informant personally observed the events and details described in paragraph one of the affidavits, satisfactorily indicating the informant's basis of knowledge.

From the informant's statement that large quantities of heroin were "being kept and sold at two separate apartments located at twenty-three Marshall Street C-4 and C-7 in Hartford," the court inferred that the informant had not viewed an isolated transaction, but part of an ongoing pattern of narcotics activity. Finally, the court noted that the place to be searched was a residence, and stated, "the very nature of the enterprise wherein the narcotics were kept in one apartment and the proceeds in a different apartment connotes a certain sophistication intended to thwart effective police investigation and prosecution. This sophistication connotes other than an isolated sale." The court therefore denied the defendant's amended motion to suppress, but granted his second amended motion to suppress, thus striking paragraphs three and four from the affidavits and barring testimony describing the police ruse.

The trial court's decision is not erroneous, despite the presence of improperly obtained evidence in the affidavit, if the lawfully obtained evidence considered by itself is sufficient to establish probable cause. *State v. Ostroski,* 201 Conn. 534, 544–45, 518 A.2d 915 (1986); *State v. Arpin,* 188 Conn. 183, 190–91, 448 A.2d 1334 (1982); *State v. Palangio,* 24 Conn. App. 300, 306, 588 A.2d 644, cert. denied, 218 Conn. 911, 591 A.2d 813 (1991); *State v. Rogers,* 18 Conn. App. 104, 556 A.2d 1030 (1989). "Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity; and (2) there is probable cause to believe that the items named will be found in the place to be

searched." *State* v. *Barton*, 219 Conn. 529, 548, 594 A.2d 917 (1991); *State* v. *Sivri*, 231 Conn. 115, 142, 646 A.2d 169 (1994).

In determining whether an affidavit established probable cause to issue a search warrant, the reviewing court applies the "totality of the circumstances" test set forth in *State* v. *Barton*, supra, 219 Conn. 544. The court "must make a 'practical, nontechnical decision whether, given all the circumstances set forth in the warrant affidavit, including the "veracity" and the "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State* v. *Rodriguez*, 223 Conn. 127, 134–35, 613 A.2d 211 (1992).

"When a search warrant affidavit is based on information provided to the police by confidential informants, the magistrate should examine the affidavit to determine whether it adequately describes both the factual basis of the informant's knowledge and the basis on which the police have determined that the information is reliable. If the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy, however, the magistrate can also consider all the circumstances set forth in the affidavit to determine whether, despite these deficiencies, other objective indicia of reliability reasonably establish that probable cause to search exists. In making this determination, the magistrate is entitled to draw reasonable inferences from the facts presented." *State* v. *Barton*, supra, 219 Conn. 544. The reviewing court may consider only the information that was actually before the issuing judge at the time the warrant was issued. *State* v. *Delmonaco*, 194 Conn. 331, 337, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984).

In determining that the affidavit, excised of paragraphs three and four, did establish probable cause, the trial court first looked to the basis of knowledge and reliability of the informant. A fair reading of the affidavit shows a "most reliable informant" who for seventeen years had given information that led to many large seizures, arrests and convictions. The informant's history of providing trustworthy information permitted the reasonable inference that the information in the affidavit was reliable. *State* v. *DeFusco*, 224 Conn. 627, 643, 620 A.2d 746 (1993). If an informant has a track record of providing reliable information, the issuing judge may credit the information given in a warrant application. *State* v. *Morrill*, 205 Conn. 560, 567, 534 A.2d 1165 (1987).

In addition, the redacted warrant affidavits establish the confidential informant's factual basis of knowledge. The informant was present in apartment C-7 on January 9, 1992, and personally observed "the purchase of 100 yellow bags of heroin from a Hispanic male known as Pedro who is described as being 5'5" tall, 140 pounds, short hair, and light complexion." That during the sale of this heroin the informant observed "Pedro walk over to . . . C-4 . . . to get the heroin but left the money at . . . C-7." An informant's personal observation of the events set forth in the affidavit satisfies the basis of knowledge requirement. *State* v. *Copeland*, 22 Conn. App. 98, 102, 576 A.2d 567 (1990). The trial court also concluded that the signing of the search warrant four days after the observation of the sale satisfied the probable cause requirement that the narcotics were present at the time of the signing. The trial court noted that in paragraph one of the affidavit the informant claimed that there was a Dominican narcotics organization actively dealing large quantities of heroin in Hartford and that they were being kept and sold out of two separate apartments,

apartments, C-4 and C-7, at 23 Marshall Street in Hartford.

We have recognized that the business of dealing in illegal drugs often involves a course of conduct that continues over a long period of time and is usually considered to be a regenerating activity. *State* v. *Brown*, 14 Conn. App. 605, 615, 543 A.2d 750, cert. denied, 208 Conn. 816, 546 A.2d 283 (1988). In addition, the fact that the places to be searched were residences indicated that they were "not merely 'a criminal forum of convenience' but rather a 'secure operational base.' " *State* v. *Johnson*, 219 Conn. 557, 568, 594 A.2d 933 (1991). We conclude that the trial court properly found that probable cause existed to issue the search warrant based on the warrant affidavits without paragraphs three and four and based on the informant's past history of reliability and his personal observations and the reasonable inferences deducted therefrom that there was an ongoing drug operation in apartments C-4 and C-7. See *State* v. *Barton*, supra, 219 Conn. 544.

The second claim is that the trial court should have granted the defendant's motion to suppress evidence attained during the warrantless search of the hallway. The facts relevant to this claim are as follows: Kanaitis and Murzin conducted a surveillance of apartments C-4 and C-7 between 10 a.m. and 3 p.m. on January 13, 1992. Outside of the hearing of the jury, Kanaitis testified that the owner of the building had given them a key permitting them to enter the common areas in the building. The multiunit building has three floors, each with seven apartments, a locked hallway and a buzzer system. Apartments C-4 and C-7 are located on the third floor, at opposite ends of the hallway shared by the seven apartments. A key is required to enter the building, as well as the hallway on each floor. A buzzer system allows the tenants on each floor to admit guests through the locked doors.

The defendant sought to exclude all testimony concerning the surveillance, claiming that the defendant had a reasonable expectation of privacy in the hallway and that it was therefore illegal for the police to enter the hallway. The trial court overruled the defendant's objection, noting that the owner of a building had given the detectives a key to a common area in which the defendant had no reasonable expectation of privacy. The defendant excepted to the trial court's ruling.

The trial court permitted the detectives to testify that they observed the defendant and two other people walking back and forth between C-4 and C-7 and that the defendant answered when they knocked on the doors to apartments C-4 and C-7. In keeping with the trial court's suppression ruling, however, the detectives did not indicate that they had entered the apartments during the surveillance.

The fourth amendment protects from unreasonable search and seizure only those areas in which a defendant can demonstrate a legitimate expectation of privacy. *State* v. *Reddick*, 207 Conn. 323, 330, 541 A.2d 1209 (1988). The court analyzes a defendant's expectation of privacy on a case-by-case basis, employing the two part test set forth in *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). *State* v. *Reddick*, supra, 331. The test inquires as to (1) whether the defendant has exhibited an actual subjective expectation of privacy, and (2) whether that expectation is one that society recognizes as reasonable. Id. A trial court's finding that a defendant did not have a reasonable expectation of privacy in the area searched may not be overturned by the reviewing court "unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law." *State* v. *Pittman*, 209 Conn. 596, 601, 553 A.2d 155 (1989).

A tenant has a reasonable expectation of privacy " 'in areas where his use is exclusive, that is, where he has the legal right to control access and to exclude others.' *United States* v. *Holland*, 755 F.2d 253, 255–56 [(2d Cir.), cert. denied, 471 U.S. 1125, 105 S. Ct. 2657, 86 L. Ed. 2d 274 (1985)] (legitimate expectation of privacy of apartment tenant exists only in an area subject to the tenant's exclusive control); *United States* v. *Arboleda*, 633 F.2d 985, 991 (2d Cir. 1980) [cert. denied, 450 U.S. 917, 101 S. Ct. 1362, 67 L. Ed. 2d 343 (1981)] (apartment dweller's legitimate privacy expectation exists in area where tenant has the right to exclude others); *State* v. *Ragsdale*, 381 So. 2d 492, 497 (La. 1980) (apartment dweller had reasonable expectation of privacy in completely enclosed patio outside his apartment unit); *Commonwealth* v. *Hall*, 366 Mass. 790, 794–95, 323 N.E.2d 319 (1975) (tenant has expectation of privacy in areas over which he can control access)." *State* v. *Sealy*, 208 Conn. 689, 693–94, 546 A.2d 271 (1988), quoting *State* v. *Brown*, 198 Conn. 348, 357, 503 A.2d 566 (1986).

We agree with the trial court that the defendant cannot establish a reasonable expectation of privacy in this case because he did not have exclusive control over the hallway and could not control access or exclude others from the hallway. In fact, "[a]t any time there might be deliverypersons, the landlord, his or her agents, visitors or residents of the other apartment[s] in that common hallway and the defendant could not lawfully have excluded them from the premises." *State* v. *Sealy*, supra, 208 Conn. 694. "[A] common hallway in a [multifamily dwelling] is the means of ingress and egress to [all] apartments for visitors, deliverymen and tradesmen, among others, where one might reasonably expect to find an assortment of individuals." *State* v. *Reddick*, supra, 207 Conn. 334 n.5.

The fact that the detectives needed a key to enter the hallway is insignificant in determining whether the defendant had an expectation of privacy. Here, as in *State* v. *Sealy*, supra, 208 Conn. 691, the building owner and the tenants shared the same access to the common hallway and the same means of admitting guests through the buzzer system. The mutual use and control of the property by the tenants and the building owner undermines the defendant's asserted expectation of privacy.

The judgment is affirmed.

In this opinion the other judges concurred.