## STATE OF CONNECTICUT *v.* CLERDE PIERRE
## (AC 33567)

Lavine, Beach and Alvord, Js.

Argued September 12—officially released November 13, 2012

*Kirstin B. Coffin,* special public defender, for the appellant (defendant).

*Maria del Pilar Gonzalez,* certified legal intern, with whom were *Harry Weller,* senior assistant state's attorney, and, on the brief, *David I. Cohen,* state's attorney, and *Joseph C. Valdes,* assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Clerde Pierre, appeals from the judgment of conviction, rendered after a jury trial, of attempted criminal possession of a firearm in violation of General Statutes §§ 53a-49 (a) (1) and 53a-217 (a) (1), criminal possession of a pistol in violation of General Statutes § 53a-217c and possession of marijuana with intent to distribute in violation of General Statutes § 21a-277 (b). On appeal, the defendant claims that the court improperly denied his motion to suppress evidence that the police seized from the attic of a rooming house because he had a reasonable expectation of privacy in the attic space.[1] We affirm the judgment of the trial court.

---

[1] The defendant also claims that the statement he gave to the police after being confronted with the gun and marijuana should have been suppressed because it was solicited using evidence that he claims was unlawfully seized.

The record reveals the following facts either were found by the trial court or are undisputed. At approximately 6:20 p.m. on February 14, 2004, members of the Stamford police department arrived at 1318 Bedford Street after receiving a 911 call from one of the building's tenants reporting a disturbance involving a gun. As officers arrived, they parked their cars in the rear lot and entered the rooming house through the unlocked back door. Police officers proceeded up the stairs to the third floor and encountered the defendant in the hallway. The jamb and molding surrounding the door to room 3A were damaged. When Officer Peter Altobelli engaged him in conversation, the defendant said he resided in room 3A.

Altobelli told the defendant that he was trying to locate a gun that was mentioned in a 911 call and asked if he could search the defendant's room. The defendant consented and, because his room was very small, the search was complete in three to four minutes. Officers also searched the second and third floor hallways of the rooming house and talked with the defendant's downstairs neighbor. Officer Don Walters searched the part of the third floor hallway located farthest from the stairway and the defendant's room. The hallway ended at an alcove, which was essentially a foyer for the door that opened onto the fire escape. In the alcove,[2] Walters noticed an opening in the ceiling that appeared to be access to an attic space. He could not see into the attic, but he was able to locate a stool just outside the alcove, and by standing on the stool, he was able to peek into the attic.

Peering into the attic, Walters believed he could see the butt of a gun, but he was unable to reach it. He

---

[2] The space referred to as an alcove was a continuation of the hallway set off by a door frame with no door. At the suppression hearing it was referred to as an "alcove," a "foyer" and a "little cubic area."

enlisted the aid of Officers Chris Baker and Robert Somody, and Baker was able to pull himself into the attic by placing one foot in the clenched hands of Somody and placing his other foot on the knob of the fire escape door. Baker was unable to see anything initially, but after being handed a flashlight from his partner below, he saw a gun and a bag approximately three or four feet from the attic opening. He also noticed that the attic appeared to be unfinished. He retrieved the gun and the bag and, upon opening the bag, observed several smaller bags containing marijuana. The defendant was confronted with the items and subsequently gave a formal statement implicating himself as the owner of the gun and the marijuana.

The defendant sought to have the gun and the marijuana suppressed as products of an unlawful search and his statement to the police suppressed as "fruit of the poisonous tree."[3] (Internal quotation marks omitted.) In a 2006 suppression hearing, the defendant argued that he had a reasonable expectation of privacy in the attic of the building. The state argued that the defendant did not have a reasonable expectation of privacy in the attic, and that, even if he did, the exigent circumstances of a 911 call referring to a gun allowed officers to ensure their safety and the safety of the building's occupants by conducting a search of the attic. The court agreed with the state's argument that the defendant did not have a reasonable expectation of privacy in the attic and denied the defendant's motion to suppress.[4] The defendant subsequently was found guilty by a jury, and this appeal followed.

---

[3] The fruit of the poisonous tree doctrine states that "evidence otherwise admissible but discovered as a result of an earlier violation is excluded as tainted, lest the law encourage future violations." *Missouri* v. *Seibert*, 542 U.S. 600, 612 n.4, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (citing *Wong Sun* v. *United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 [1963]).

[4] The court did not address the issue of exigent circumstances in its 2006 oral memorandum of decision. In preparation for this appeal, the defendant filed a motion for articulation requesting that the trial court determine

On appeal, the defendant claims that, pursuant to the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut, the court improperly denied his motion to suppress the evidence seized from the attic. He contends that he had a subjective expectation of privacy when he placed the items in the attic, and his expectation of privacy is one that society recognizes as reasonable. He therefore asserts that the evidence seized from the attic should have been suppressed. He further argues that his statement to the police should be suppressed as "fruit of the poisonous tree" because the seized evidence was the subject of the statement. Finally, the defendant maintains that the situation that led the police to the building did not constitute exigent circumstances, which would excuse the nonexistence of a warrant. Because the "fruit of the poisonous tree" and exigent circumstances arguments need only be addressed should we conclude that the defendant had a reasonable expectation of privacy, we begin there.

"As a threshold matter, we set forth the appropriate standard pursuant to which we review a challenge to a trial court's decisions regarding a suppression motion. This involves a two part function . . . . [T]o the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary; and we must decide whether those conclusions are legally and logically correct in light of the findings of fact. . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision

whether the exigent circumstances in this case justified finding an exception to the warrant requirement. The court granted the motion and held that "[t]he circumstances, in their totality, did not rise to the level of exigency as to obviate the warrant requirement of the [f]ourth [a]mendment."

was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Miller*, 137 Conn. App. 520, 528, 48 A.3d 748, cert. denied, 307 Conn. 914, 54 A.3d 179 (2012).

"The application of the fourth amendment prohibition against unreasonable searches and seizures requires the defendant to establish that he had a legitimate expectation of privacy in the invaded area. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . The determination of whether such an expectation exists is to be made on a case by case basis . . . and requires a two-part inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and second, whether that expectation is one society recognizes as reasonable." (Citations omitted; internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 94, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). This two part test was first set forth by the United States Supreme Court in *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring), and has been referred to as the *Katz* test by subsequent courts. See, e.g., *Kyllo* v. *United States*, 533 U.S. 27, 34, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); *Minnesota* v. *Carter*, 525 U.S. 83, 97, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998); *State* v. *Payne*, 121 Conn. App. 308, 329, 996 A.2d 302, cert. denied, 297 Conn. 919, 996 A.2d 1193 (2010).

Analyzing the objective second prong of the *Katz* test requires inquiring whether the open attic space of a three-story rooming house is a place where society recognizes that the defendant had a reasonable expectation of privacy. "The determination that a particular place is protected under the fourth amendment requires that it be one in which society is prepared, because of its

code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy." (Internal quotation marks omitted.) *State* v. *Mooney*, supra, 218 Conn. 95. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"; *United States* v. *United States District Court*, 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972); and therefore "[c]ontemporary concepts of living such as multi-unit dwellings must not dilute [the defendant's] right to privacy any more than absolutely required." *Fixel* v. *Wainwright*, 492 F.2d 480, 484 (5th Cir. 1974). Attempting to define the "home" in the context of a rooming house must be done cautiously to ensure that the protections of the fourth amendment are afforded to citizens in a class neutral manner. "We should vigilantly guard against permitting . . . inroads upon the reasonable expectations of privacy of the lesser situated of our citizens who are forced by economic circumstances to reside in rooming houses." *People* v. *Garriga*, 189 App. Div. 2d 236, 241–42, 596 N.Y.S.2d 25, leave to appeal denied, 82 N.Y.2d 718, 622 N.E.2d 316, 602 N.Y.S.2d 815 (1993).

Courts have attempted to strike a balance between preserving the fourth amendment protections of one's home for those living in multiunit dwellings, while recognizing that certain characteristics of such structures inherently render places within them more public. "[A]n individual tenant may have a constitutionally cognizable expectation of privacy in areas where his use is exclusive, that is, where he has the right to control access and to exclude others." (Internal quotation marks omitted.) *State* v. *Sealy*, 208 Conn. 689, 693, 546 A.2d 271 (1988). "Of course, one need not have an untrammeled power to admit and exclude in order to claim the protection of the fourth amendment, so long as the place involved is one affording an expectation of privacy that society

regards as reasonable." (Internal quotation marks omitted.) *State* v. *Mooney*, supra, 218 Conn. 95–96. The exclusivity and limited accessibility that are the foundation for a finding of an expectation of privacy apply when analyzing the privacy of a particular area within a multiunit dwelling. "Police observations in the common areas of multiple family dwellings do not constitute a search under the fourth amendment if the circumstances indicate that the area is readily accessible to outsiders. . . . The contrary is true, however, if the area is sufficiently secured so as to give the tenants a justified expectation of privacy." (Citation omitted.) *State* v. *Reddick*, 207 Conn. 323, 332, 541 A.2d 1209 (1988).

The parameters of a home that the fourth amendment protects are, of course, easier to define when considering a single-family dwelling. "Although the [f]ourth [a]mendment protects people, not places . . . the place searched is highly relevant to the fourth amendment analysis because expectations of privacy in some places are afforded greater constitutional legitimacy than in others." (Citation omitted; internal quotation marks omitted.) *State* v. *Mooney*, supra, 218 Conn. 94–95. In cases that involve multiunit dwellings, the line between public and private is often far murkier. Compare *United States* v. *Booth*, 455 A.2d 1351, 1354 (D.C. App. 1983) (holding that defendant residents "had a legitimate expectation of privacy in the front hallway of the house they shared, which was not obviously a rooming house open to the general public") with *State* v. *Sealy*, supra, 208 Conn. 694 (holding that tenant renting third floor of three level rental house, which had one tenant per floor, had no reasonable expectation of privacy in stairway leading to third floor); *Fixel* v. *Wainwright*, supra, 492 F.2d 484 (distinguishing between fenced-in backyard of four unit apartment building and common hallways of such building where tenants would

expect to encounter salesmen or businessmen) with *United States* v. *Acosta,* 965 F.2d 1248, 1257 (3d Cir. 1992) (finding that defendant's authorized but limited use of backyard of multiunit dwelling did not afford him reasonable expectation of privacy there). As the subtle distinctions between these cases demonstrate, "[w]hether a defendant's actual expectation of privacy in a particular place is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Internal quotation marks omitted.) *State* v. *Mooney,* supra, 94. The nature of the structure at 1318 Bedford Street is therefore critical to our determination of where within the rooming house the defendant had a reasonable expectation of privacy.

The following additional facts pertaining to the nature of the structure either were found by the trial court or are undisputed. The building at 1318 Bedford Street was a rooming house with law offices on the first floor that were accessed through the front door and rooms for rent on the second and third floors that were accessed through the back door. There were six rental units in the rooming house, and there was a communal bathroom located on both the second and third floors. At the time of the incident, at least one residential tenant and one business occupied units on the second floor and at least one residential tenant, the defendant, occupied a unit on the third floor.

The parking lot behind 1318 Bedford Street was used by clientele of the building's businesses during the day and by the building's residential tenants after working hours. Each tenant had a key to his or her individual room and to the back door of the building. According to tenants and frequent visitors of the building, the back door always was unlocked during business hours and usually unlocked until very late at night. The interior of 1318 Bedford Street also was accessed via a fire

escape attached to the rear of the building. The third floor landing of the fire escape was both an access point to the building and a modified porch, and the fire escape door opened into the alcove where access to the attic was located. An unattached piece of plywood that could be used to cover the attic space opening was lying adjacent to the opening in the attic, but the opening was uncovered when officers observed and seized the evidence at issue.

The defendant encourages us to equate the attic of 1318 Bedford Street with the basement of the duplex our Supreme Court analyzed in *State* v. *Reddick*, supra, 207 Conn. 323. In *Reddick*, the police seized a firearm during a search of the shared basement of a duplex after obtaining a search warrant for only the second and third floors. Id., 326–27. The Supreme Court held that the search was unlawful because the occupants of each unit in the duplex exercised substantial control over the basement space, as evidenced by the facts that the basement was only accessible through the interior of either home and that there were only two homes within the structure. Id., 333.

The state, on the other hand, encourages us to analogize the attic of 1318 Bedford Street to the hallway of a twenty-one unit apartment building this court analyzed in *State* v. *Torres*, 36 Conn. App. 488, 651 A.2d 1327, cert. denied, 232 Conn. 912, 654 A.2d 357 (1995). In *Torres*, this court held that a tenant of a twenty-one unit apartment building did not have a reasonable expectation of privacy in the common hallways of that apartment building because "at any time there might be deliverypersons, the landlord, his or her agents, visitors or residents of the other apartment[s] in that common hallway and the defendant could not lawfully have excluded them from the premises." (Internal quotation marks omitted.) Id., 500. This court found that it was

reasonable to expect that " 'an assortment of individuals' " would populate the common hallway of an apartment building, and, therefore, it was unreasonable to expect privacy. Id.; see *State* v. *Reddick*, supra, 207 Conn. 334 n.5.

One difference among the six unit rooming house at 1318 Bedford Street, the twenty-one unit apartment building in *Torres* and the two unit duplex in *Reddick* is the size of the structures. The number of residences located in 1318 Bedford Street, six, is obviously closer to the two residences in the duplex in *Reddick* than it is to the twenty-one residences in the apartment building in *Torres*. While the building's residential capacity can be important in determining a defendant's reasonable expectation of privacy in a place, it is mostly so only to the degree it defines the character of the building, including limitations on access others have to the place searched or the ability of the defendant to exercise control over that place. See *United States* v. *King*, 227 F.3d 732, 750 (6th Cir. 2000) ("the nature of the living arrangements of a duplex, as opposed to a multi-unit apartment building, affords the tenant of the duplex a greater expectation of privacy in areas the tenant of the multi-unit apartment building would not enjoy, because in the case of a duplex, access to such areas is limited to the duplex's tenants and landlord"); see also *State* v. *Sealy*, supra, 208 Conn. 694 (holding that tenant who was sole occupant of third floor of multiunit dwelling, with one tenant on second floor and business on first floor, had no reasonable expectation of privacy in common stairway leading to third floor).

It is uncontested that the police officers, in response to the 911 call, were lawfully in the hallways of 1318 Bedford Street.[5] *Torres* leads us to conclude that the

---

[5] No claim that the police were unlawfully within the structure at 1318 Bedford Street was made at trial or on appeal.

defendant did not have a reasonable expectation of privacy in the common hallways of the rooming house because they were open to the public and that Walters could, therefore, lawfully search the third floor hallway and alcove. In order to determine there was a violation of the defendant's reasonable expectation of privacy, this court would have to determine that entering the attic space of 1318 Bedford Street was sufficiently similar to entering the basement in *Reddick*. An open, unfinished attic that is accessed from a common area is factually distinct from a closed basement, accessed only from a private area, that is used for storage of personal items and completing household chores.

While neither *Torres* nor *Reddick* completely reflect the facts of this case, both cases emphasize the importance of access to and control over the place in question. The logic of *Torres* that cautions against finding a reasonable expectation of privacy in a place that is open and accessible to others is applicable in this case. See *State* v. *Torres*, supra, 36 Conn. App. 500–501. Tenants and visitors freely entered 1318 Bedford Street through both the back door and the fire escape, and those entering through the fire escape passed below the unlocked and open attic space.[6] The defendant was not in a position to restrict the landlord's agents, delivery persons or other tenants' visitors from passing below, peering into or even climbing through the opening into the attic. While it is likely that fewer people accessed the attic than walked down the hallways at 1318 Bedford Street, the defendant had the same inability to control the access of others to either space. The lack of control over the attic and the unfettered public access to the

---

[6] Though the record reflects that the attic space could be covered by a piece of plywood, it also reflects that the plywood was not covering the opening at the time the officers saw and seized the evidence. We therefore view the attic as open and do not postulate on the implications of a cover that potentially could restrict access and vision into the attic space.

interior of 1318 Bedford Street is substantially different from the basement in *Reddick*, which was only accessible by passing through either of the two residential units of the structure. See *State* v. *Reddick*, supra, 207 Conn. 333. The uncovered attic opening adjacent to an entrance into 1318 Bedford Street is much more akin to an extension of a common hallway than the private basement in *Reddick*.[7]

We conclude that the defendant did not have an expectation of privacy in the attic space at 1318 Bedford Street that society would recognize as reasonable. It is therefore unnecessary to discuss whether the defendant had a subjective expectation of privacy when he placed the gun and the marijuana in the attic. See *State* v. *DeFusco*, 224 Conn. 627, 633 n.9, 620 A.2d 746 (1993) ("whether the defendant possessed a subjective expectation of privacy . . . is unnecessary to the resolution of this case in light of our conclusion that the defendant has not satisfied the second part of the *Katz* test"). In light of our finding that the defendant did not have a reasonable expectation of privacy in the attic of 1318 Bedford Street, we need not consider the state's contention that exigent circumstances permitted searching

---

[7] It is important to note that there is no evidence that the defendant ever used the attic space prior to placing a gun and marijuana there in anticipation of the police arriving at 1318 Bedford Street. The defendant testified that he assumed that any tenant could use the space, but there is nothing in the record to establish that he had any relationship with the space. According to the testimony of Baker, the attic was unfinished and did not appear to contain anything of interest. The defendant's relationship with the place searched is usually a more significant factor when determining the defendant's subjective privacy. See *State* v. *Boyd*, 57 Conn. App. 176, 185, 749 A.2d 637 (listing factors that defendant must prove to show he had subjective expectation of privacy as: "[1] his relationship with the location was personal in nature, [2] his relationship with the location was more than sporadic, irregular or inconsequential, and [3] he maintained the location and the items within it in a private manner at the time of the search" [internal quotation marks omitted]), cert. denied, 253 Conn. 912, 754 A.2d 162 (2000). It is, however, also probative of whether the space in question was part of his home and, therefore, part of a place where society would recognize that he has a reasonable expectation of privacy.

the attic without a warrant and the defendant's contention that his statement to police after they discovered the evidence should be suppressed as "fruit of the poisonous tree."

The judgment is affirmed.

In this opinion the other judges concurred.