******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DENNIS KONO
(SC 19613)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa,
Robinson and Vertefeuille, Js.

*Argued March 30—officially released December 22, 2016\**

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, and *David N. Clifton*, assistant state's attorney, for the appellant (state).

*Daniel M. Erwin*, with whom, on the brief, were *Norman A. Pattis* and *Frederick M. O'Brien*, for the appellee (defendant).

*Opinion*

PALMER, J. The issue presented by this appeal is whether article first, § 7, of the Connecticut constitution[1] prohibits the police from conducting a warrantless canine sniff of the front door of a condominium in a multiunit condominium complex, and the common hallway adjacent thereto, for the purpose of detecting marijuana inside the condominium. The state appeals[2] from the judgment of the trial court, which suppressed evidence seized from the condominium of the defendant, Dennis Kono, following such a canine sniff. The trial court concluded that the canine sniff constituted a search within the meaning of the fourth amendment to the United States constitution and, therefore, required a warrant predicated on probable cause. We conclude that the canine sniff violated article first, § 7, and, accordingly, we affirm the judgment of the trial court.[3]

I

THE FACTS

The record reveals the following undisputed facts. In May, 2012, the Berlin Police Department received an anonymous tip that the defendant was boasting about growing marijuana at a condominium complex on Main Street in the town of Berlin. The case was assigned to Detective Shaun Solek, who determined that the condominium complex in question was a former factory located at 10 Main Street. Solek also discovered that the defendant lived in unit 204. Because the complex was still under construction, Solek contacted the developer, Corporation for Independent Living (developer), to request permission to enter the building. The developer referred Solek to the property manager, Connecticut Real Estate Management, whose owner, Alyssa Pillion, signed a consent form allowing Solek and Officer Eric Chase, a canine handler with the Berlin Police Department, to conduct a canine examination of the common areas of the building.

On the afternoon of May 29, 2012, Solek and Chase went to the condominium complex and were admitted into the building by Stephen Martino, the developer's property manager. As the trial court found, "[t]he first two floors contained thirty-four residential units, only a portion of which [was] completed and occupied. The outside doors to the multiunit building are normally locked, and access is gained through a keypad. Chase, who is a trained canine handler, was accompanied by his German Shepherd dog, Zeusz. Zeusz had been trained to detect eight substances including marijuana, hash[ish], crack cocaine, cocaine, ecstasy, and methamphetamine. Prior to the search of the complex, Chase was not informed . . . which condominium unit was under investigation.

"Chase first had Zeusz conduct a presearch of the first floor common hallway. During the presearch, Zeusz

is allowed to walk throughout the hallway without direction from his handler. After the presearch, Chase conducted a directed search in which Zeusz was commanded to sniff at the bottom of the front door of each condominium [unit] on the first floor. The same presearch and directed search procedures were also conducted on the second floor. When Zeusz performed his sniff at the bottom of the door to unit 204, the dog sat down in front of the door, which constituted a passive alert that [Zeusz] had detected contraband. Chase directed Zeusz to perform a second directed search on the second floor and Zeusz again gave a passive alert for drugs at unit 204. Chase knocked on the door but received no response. Chase remained at the door to [e]nsure that no one entered the premises, and Solek left to prepare a search warrant for [the] unit . . . . Approximately four hours later, Solek returned with a signed search warrant. Upon executing the warrant, the police discovered an indoor greenhouse containing marijuana plants, as well as seeds, lighting equipment and various firearms." The defendant was arrested and charged with several drug offenses and illegal possession of an assault weapon.

## II

### THE TRIAL COURT'S DECISION

The defendant subsequently filed a motion to suppress the evidence seized from his condominium on the ground that a canine sniff of the threshold of his home, for the purpose of investigating the home's contents, constituted a search under both the fourth amendment and article first, § 7, of the state constitution. Specifically, the defendant argued that his front door and the hallway adjacent thereto were within the constitutionally protected curtilage of his condominium unit such that the entry of a dog into that area for the purpose of conducting a drug sniff constituted a trespass. The defendant further argued that a sniff by a well trained narcotics dog for the purpose of detecting drugs inside his home violated his reasonable expectation of privacy under *Katz* v. *United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). See id., 351, 353 (inquiry for fourth amendment purposes is whether individual "seeks to preserve [something] as private" and whether that subjective expectation of privacy is objectively "justifiabl[e]" under circumstances); see also id., 361 (Harlan, J., concurring) (application of fourth amendment depends on whether individual has "exhibited an actual [subjective] expectation of privacy" and whether that subjective expectation is "one that society is prepared to recognize as 'reasonable' "). The trial court agreed that the canine sniff violated the defendant's reasonable expectation of privacy under the fourth amendment and granted the defendant's motion to suppress. In light of its determination that the police had violated the federal constitution, the court did not reach

the defendant's claim under the state constitution. The trial court did note, however, that this court "has to date [declined to rule] on whether a canine sniff is . . . a search under article first, § 7, of the Connecticut constitution . . . ." (Citations omitted.) *State* v. *Kono*, Superior Court, judicial district of New Britain, Docket No. H15N-CR-12-0264061-S (November 18, 2014); see, e.g., *State* v. *Waz*, 240 Conn. 365, 371, 692 A.2d 1217 (1997) (declining to decide whether canine sniff of parcel constituted search under article first, § 7, because, "even if it did, the state constitution requires no more than a showing that the investigating officers had a reasonable and articulable suspicion that the parcel contained contraband").[4]

In reaching its determination, the trial court relied on *United States* v. *Thomas*, 757 F.2d 1359, 1367 (2d Cir.), cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819, 106 S. Ct. 66, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Wheelings* v. *United States*, 474 U.S. 819, 106 S. Ct. 67, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Rice* v. *United States*, 479 U.S. 818, 107 S. Ct. 78, 93 L. Ed. 2d 34 (1986), in which the Second Circuit held that a canine sniff of a person's front door in a multiunit apartment building, for the purpose of detecting drugs inside the apartment, constituted a search within the meaning of the fourth amendment. The trial court also relied on *Florida* v. *Jardines*, U.S. , 133 S. Ct. 1409, 1417–18, 185 L. Ed. 2d 495 (2013), and *Kyllo* v. *United States*, 533 U.S. 27, 34–35, 40, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001), in which the United States Supreme Court held that a canine sniff conducted within the curtilage of a single-family residence (*Jardines*) and the thermal imaging of a single-family residence (*Kyllo*), for purposes of detecting marijuana therein, violated the fourth amendment to the United States constitution. Describing the holding in *Thomas* as "prescient," the trial court noted that, although the Second Circuit's view was once considered an outlier, *Kyllo* and *Jardines* had vindicated the Second Circuit's determination that a canine sniff of the exterior of a person's home, even one located in a multiunit apartment building, violates the fourth amendment if the purpose of the canine sniff is to detect drugs inside the home.

The trial court also rejected the state's contention that the search did not require a warrant supported by probable cause "because a dog sniff can . . . determine [only] whether a home contains contraband, and no one has a reasonable expectation of privacy in contraband." In support of this contention, the state relied on *United States* v. *Place*, 462 U.S. 696, 698, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983), and *Illinois* v. *Caballes*, 543 U.S. 405, 410, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005), which held, respectively, that a canine sniff of luggage at a public airport and a canine sniff of a motor vehicle are not searches for fourth amendment pur-

poses because a subjective expectation of privacy in contraband is not recognized as reasonable, and a canine sniff for illegal drugs reveals only the existence of that contraband and nothing more.[5] The trial court explained that, although "it is true that a canine sniff is not a search when used to detect drugs in luggage at an airport; *United States* v. *Place,* supra, [707]; or in a motor vehicle; *Illinois* v. *Caballes*, supra, [409]; *Jardines* teaches us that the use of a drug detection dog is a search when [the dog] is used to investigate the contents of someone's home. We also know from *Kyllo* that the contraband distinction stops at the front door of a home because, in the home . . . all details are intimate details . . . . *Kyllo* v. [*United States*], supra, 533 U.S. 37." (Internal quotation marks omitted.)

Finally, the trial court rejected the state's contention that a warrant was not required because "the police were lawfully present in the common hallway outside the defendant's front door," an area where, in the state's view, the defendant had no reasonable expectation of privacy or any property interest sufficient to protect against the officers' warrantless intrusion. In the trial court's view, it was immaterial that the police were lawfully present in the hallway, or that the defendant had a diminished expectation of privacy in the common areas of his condominium complex, because the privacy interest at stake did not relate to those areas but, rather, to the inside of the defendant's home. The trial court also expressed concern that allowing the police to conduct warrantless canine sniffs of the front doors of apartments and condominium units but not of single-family homes—the practice found to violate the fourth amendment in *Jardines*—would impermissibly apportion constitutional rights on the basis of economic class.

Specifically, the trial court stated: "The use of a drug detection dog situated in a common hallway outside the front door to a condominium [unit] is no less an intrusion into the privacy of one's home than the [use of a] drug detection dog . . . on the front porch of the single-family residence in *Jardines*. To rule otherwise would afford residents of this state who reside in multi-family apartments less a measure of privacy protected by the fourth amendment than their more well-off neighbors." The trial court stated further: "It would also allow law enforcement to troll through the hallways of apartment buildings, including public housing projects, with drug sniffing dogs to search for contraband within individual apartments. . . . Such arbitrary and unfettered discretion is assuredly repugnant to the fourth amendment." (Citation omitted.) Thereafter, the trial court granted the defendant's motion to dismiss the charges against him on the ground that none of the state's evidence would be admissible at a trial.

III

ANALYSIS UNDER ARTICLE FIRST, § 7, OF

## THE CONNECTICUT CONSTITUTION

On appeal, the state reasserts its contention that the canine sniff of the defendant's front door and the hallway adjacent thereto was not a search under article first, § 7, because the defendant had no reasonable expectation of privacy in the area searched or in the contraband inside his home. We are not persuaded by the state's argument.

It is well established that this court, in determining whether the police conducted a search under article first, § 7, "employ[s] the same analytical framework that would be used under the federal constitution. . . . Specifically, we ask whether the defendant has established that he had a reasonable expectation of privacy in the area or thing searched."[6] (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 310, 929 A.2d 278 (2007). In the absence of "such an expectation, the subsequent police action has no constitutional ramifications. . . . The determination of whether such an expectation exists is to be made on a [case-by-case] basis . . . and requires a [two part] inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and, second, whether that expectation is one society recognizes as reasonable. . . . Whether a defendant's actual expectation of privacy in a particular place is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances. . . .

"The determination that a particular place is protected under [article first, § 7] requires that it be one in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy. . . . It must be one that society is prepared to recognize as reasonable. . . . Legitimate expectations of privacy derive from concepts of real or personal property law or [from] understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. . . . Of course, one need not have an untrammeled power to admit and exclude in order to claim the protection of [article first, § 7, as] long as the place involved is one affording an expectation of privacy that society regards as reasonable."[7] (Citations omitted; internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 94–96, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

Additional principles guide our analysis of the state's claim, chief among them the bedrock principle that "[p]rivacy expectations are . . . highest and are

accorded the strongest constitutional protection in the case of a private home and the area immediately surrounding it." *State* v. *Brown*, 198 Conn. 348, 356–57, 503 A.2d 566 (1986); see also *Bozrah* v. *Chmurynski*, 303 Conn. 676, 690, 36 A.3d 210 (2012) ("[n]owhere are expectations of privacy greater than in the home" [internal quotation marks omitted]). It is also axiomatic "that a search or seizure conducted without a warrant issued upon probable cause is presumptively unreasonable. Our constitutional preference for warrants is overcome only in specific and limited circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Waz*, supra, 240 Conn. 374 n.16; see also *State* v. *Miller*, 227 Conn. 363, 382, 630 A.2d 1315 (1993) ("[t]his court's precedents involving the state constitution's warrant requirement express a strong policy in favor of warrants").

Finally, "[i]n determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in [*State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992)]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]. . . . We have noted, however, that these factors may be inextricably interwoven, and not every [such] factor is relevant in all cases." (Citations omitted; internal quotation marks omitted.) *State* v. *Skok*, 318 Conn. 699, 708, 122 A.3d 608 (2015). In the present case, "our adjudication of the defendant's state constitutional claim is informed principally by those federal and sister state cases involving the use of a trained narcotics detection dog."[8] *State* v. *Waz*, supra, 240 Conn. 374. We also consider whether the distinction that the state would have us draw under article first, § 7, between the front door of a single-family residence and that of a home located in a multiunit building finds support in our own case law or public policies of this state. With these principles in mind, we turn to the relevant federal precedent.

On balance, we believe that federal precedent provides support for the defendant's claim of a state constitutional violation. As we previously noted, the Second Circuit Court of Appeals decided more than thirty years ago that a canine sniff of the common hallway of a multiunit apartment building, for the purpose of detecting drugs inside one of the apartments, constitutes a search within the meaning of the fourth amendment. *United States* v. *Thomas*, supra, 757 F.2d 1367. *Thomas* not only remains good law in the Second Circuit; see *United States* v. *Hayes*, 551 F.3d 138, 144 (2d Cir. 2008) (distinguishing *Thomas* but reaffirming that

canine sniff of apartment door in multiunit apartment building is subject to constraints of fourth amendment); but it has been strengthened by recent federal precedent. See *United States* v. *Whitaker*, 820 F.3d 849, 852–54 (7th Cir. 2016) (reasonable expectation of privacy in home prohibits canine sniff of apartment door in multiunit building); and presumptively carries particular weight with this court.[9]

Although the United States Supreme Court has never resolved the issue decided in *Thomas*,[10] we agree with the trial court that *Kyllo* and *Jardines* tend to favor the defendant's position. In *Kyllo*, federal agents suspected that the petitioner, Danny Kyllo, was growing marijuana inside his home in a three-family residence. *Kyllo* v. *United States*, supra, 533 U.S. 29. During their investigation, the agents "used an Agema Thermovision 210 thermal imager to scan the [three-family residence]. . . . The scan . . . showed that the roof over the garage and a side wall of [Kyllo's unit] were relatively hot compared to the rest of the home and substantially warmer than neighboring homes in the [three-family residence]." Id., 29–30. On the basis of this information and certain other facts, the agents obtained a warrant to search Kyllo's unit and there discovered more than 100 marijuana plants growing under grow lights. Id., 30.

After the Ninth Circuit Court of Appeals upheld the trial court's denial of Kyllo's motion to suppress; see id., 30–31; the United States Supreme Court granted Kyllo's petition for a writ of certiorari and reversed. Id., 31, 41. In doing so, the court began its discussion of the government's claim by noting that, "[a]t the very core of the [f]ourth [a]mendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. . . . With few exceptions, the question whether a warrantless search of a home is reasonable and [thus] constitutional must be answered no." (Citation omitted; internal quotation marks omitted.) Id., 31. It then explained that "[t]he . . . case involves officers on a public street engaged in more than [naked eye] surveillance of a home. [The court has] previously reserved judgment as to how much technological enhancement of ordinary perception from such a vantage point, if any, is too much. [Although the court had] upheld enhanced aerial photography of an industrial complex in *Dow Chemical* [*Co.* v. *United States*, 476 U.S. 227, 234–35, 239, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986)] . . . [the court] found it important that [the searched area was] *not* an area immediately adjacent to a private home, where privacy expectations are most heightened . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Kyllo* v. *United States*, supra, 533 U.S. 33. "[O]btaining by [sense enhancing] technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area . . .

constitutes a search—at least [when, as in *Kyllo*] the technology in question is not in general public use. This assures preservation of that degree of privacy against government that existed when the [f]ourth [a]mendment was adopted. On the basis of this criterion, the information obtained by the thermal imager . . . was the product of a search." (Citation omitted; internal quotation marks omitted.) Id., 34–35.

In reaching its conclusion, the court rejected the government's contention that the thermal imaging was not a search because it did not reveal "private activities occurring in private areas . . . ." (Citation omitted; internal quotation marks omitted.) Id., 37. As the court explained, "[t]he [f]ourth [a]mendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. . . . In the home . . . *all* details are intimate details, because the entire area is held safe from prying government eyes." (Emphasis in original.) Id. After observing that the thermal imager could detect lawful activity, even intimate details such as "at what hour each night the lady of the house takes her daily sauna and bath"; id., 38; the court concluded: "[T]he [f]ourth [a]mendment draws a firm line at the entrance to the house . . . . That line . . . must be not only firm but also bright—which requires clear specification of those methods of surveillance that require a warrant. [Although] it is certainly possible to conclude from the . . . thermal imaging [scan] . . . that no significant compromise of the homeowner's privacy ha[d] occurred, [the court] must take the long view . . . from the original meaning of the [f]ourth [a]mendment forward." (Citation omitted; internal quotation marks omitted.) Id., 40. When, as in *Kyllo*, "the [g]overnment uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a search and is presumptively unreasonable without a warrant." (Internal quotation marks omitted.) Id.

More recently, in *Jardines*, the court was asked to decide "whether using a [drug sniffing] dog on a homeowner's porch to investigate the contents of the home is a search within the meaning of the [f]ourth [a]mendment." (Internal quotation marks omitted.) *Florida* v. *Jardines*, supra, 133 S. Ct. 1413. In that case, the police received a tip that the respondent, Joelis Jardines, was growing marijuana inside his single-family residence. Id. On the basis of that information, a police drug detection dog and his handler were dispatched to Jardines' home to conduct a sniff test of the exterior of the residence. Id. As the court explained, "[t]he dog was trained to detect the scent of marijuana, cocaine, heroin, and several other drugs, indicating the presence of any of these substances through particular behavioral changes recognizable by his handler." Id. "As the dog approached Jardines' front porch, he apparently sensed

one of the odors he had been trained to detect, and began energetically exploring the area for the strongest point source of that odor." Id. "After sniffing the base of the front door, the dog sat, which is the trained behavior [that the dog exhibits when he discovers] the odor's strongest point." Id. On the basis of the dog's reaction, the police obtained a warrant to search Jardines' residence, where they found several marijuana plants. Id.

Jardines was charged with trafficking in cannabis and later moved to suppress the evidence seized from his home on the ground that the officers' use of a dog to detect drugs inside the home violated the fourth amendment. See id. The trial court agreed and granted the motion. See id. That judgment, however, was reversed by the Florida District Court of Appeal, whose judgment, in turn, was reversed by the Florida Supreme Court. See id. The United States Supreme Court then granted Florida's petition for a writ of certiorari; see id., 1414; "limited to the question of whether the officers' behavior was a search within the meaning of the [f]ourth [a]mendment." Id. The court concluded that it was. Id., 1417–18.

In doing so, however, the court did not apply the reasonable expectation of privacy test recognized in *Katz*, as it did in *Kyllo*, but opted instead to view the matter through a common-law property lens. See id., 1414. The court explained: "The [fourth] [a]mendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the [g]overnment obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the [f]ourth [a]mendment has undoubtedly occurred." (Internal quotation marks omitted.) Id. "That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which [the court has] held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." Id.

Having determined that the officers intruded on constitutionally protected curtilage, the court next considered whether Jardines "had given his leave (even implicitly) for them to do so." Id., 1415. The court concluded that he had not, stating in relevant part: "[The court has] . . . recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds. . . . This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger

longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the [n]ation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do. . . .

"But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to . . . call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. . . . Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) Id., 1415–16.[11]

In a concurring opinion joined by Justices Ginsburg and Sotomayor, Justice Kagan explained that she "could just as happily have decided [the case] by looking to Jardines' privacy interests." Id., 1418 (Kagan, J., concurring). Such a decision, she asserted, would have looked very much like the majority opinion. See id., 1418–19 (Kagan, J., concurring) "It would have talked about the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. . . . It would have insisted on maintaining the practical value of that right by preventing police officers from standing in an adjacent space and trawl[ing] for evidence with impunity. . . . It would have explained that privacy expectations are most heightened in the home and the surrounding area. . . . And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there." (Citations omitted; internal quotation marks omitted.) Id.

Justice Kagan also explained that "the sentiment 'my home is my own,' while originating in property law, now also denotes a common understanding—extending even beyond that law's formal protections—about an especially private sphere. Jardines' home was his property; it was also his most intimate and familiar space. The analysis proceeding from each of those facts . . . runs mostly along the same path.

"I can think of only one divergence: If [the court] had decided this case on privacy grounds, [it] would

have realized that *Kyllo* . . . already resolved it. The [court in] *Kyllo* . . . held that police officers conducted a search when they used a [thermal imaging] device to detect heat emanating from a private home, even though they committed no trespass. Highlighting [the court's] intention to draw both a 'firm' and a 'bright' line at 'the entrance to the house' . . . [it] announced the following rule:

" 'Where, as here, the [g]overnment uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant.' . . .

"That 'firm' and 'bright' rule governs this case: The police officers . . . conducted a search because they used a 'device . . . not in general public use' (a trained [drug detection] dog) to 'explore details of the home' (the presence of certain substances) that they would not otherwise have discovered without entering the premises." (Citations omitted; footnote omitted.) Id., 1419 (Kagan, J., concurring). At the very least, therefore, *Jardines* makes clear that warrantless canine sniffs of the home are frequently unconstitutional. Justice Kagan's concurrence suggests that they are, in fact, *never* constitutional—at least in the absence of exigent circumstances.

Since *Jardines*, only one federal circuit court of appeals has considered whether a canine sniff of an apartment door in a multiunit apartment building, for the purpose of detecting drugs inside of the apartment, constitutes a search under the fourth amendment. See *United States* v. *Whitaker*, supra, 820 F.3d 850. In that case, the Seventh Circuit concluded that it was a search. Id., 854. The facts of *Whitaker* are no different from the facts in the present case: "Acting on information that drugs were being sold from a certain apartment in Madison, Wisconsin, law enforcement obtained the permission of the apartment property manager [to bring] a [narcotics detecting] dog to the locked, shared hallway of the apartment building. The dog alerted to the presence of drugs at a nearby apartment door and then went to the targeted apartment where [the defendant, Lonnie] Whitaker, was residing. After the officers obtained a search warrant, Whitaker was arrested and charged with drug and firearm crimes based on evidence found in the apartment." Id., 850.

Whitaker moved to suppress the evidence seized from his apartment, arguing, inter alia, that the use of the dog to detect contraband inside his home was a search under the fourth amendment and *Jardines*. Id., 851; see id., 850, 852. After the trial court denied his motion, Whitaker entered a conditional guilty plea, reserving his right to appeal from the trial court's ruling. Id., 850. On appeal, "Whitaker argue[d] that *Jardines* should be

extended to the hallway outside his apartment door because . . . law enforcement took the dog to his door for the purpose of gathering incriminating forensic evidence." Id., 852. Recognizing, however, "that *Jardines* was premised on trespass to property, he also argue[d] that this use of a [drug detection] dog violated his privacy interests under *Kyllo* . . . and *Katz* . . . ." (Citations omitted.) Id. The Seventh Circuit agreed with the latter contention, stating in relevant part: "The use of a [drug sniffing] dog . . . clearly invaded reasonable privacy expectations, as . . . Justice [Kagan explained in her] concurring opinion in *Jardines*. The police in *Jardines* could reasonably and lawfully walk up to the front door of the house in that case to knock on the door and ask to speak to the residents. The police were not entitled, however, to bring a '[super sensitive] instrument' to detect objects and activities that they could not perceive without its help. . . . The police could not stand on the front porch and look inside with binoculars or put a stethoscope to the door to listen. Similarly, they could not bring the [super sensitive] dog to detect objects or activities inside the home. As Justice Kagan explained, viewed through a privacy lens, *Jardines* was controlled by *Kyllo*, which held that police officers conducted a search by using a [thermal imaging] device to detect heat emanating from within the home, even without trespassing on the property." (Citations omitted.) Id., 852–53. The Seventh Circuit concluded that "[a] dog [sniff] conducted from an apartment hallway comes within this rule's ambit." Id., 853.

The Seventh Circuit noted, moreover, just as the Second Circuit did in *Thomas*, that "the fact that this was a search of a home distinguishes this case from dog sniffs in public places in *United States* v. *Place*, [supra, 462 U.S. 698] (luggage at airport), and *Illinois* v. *Caballes*, [supra, 543 U.S. 406] (traffic stop). Neither case implicated the [f]ourth [a]mendment's core concern of protecting the privacy of the home. It is true that Whitaker did not have a reasonable expectation of complete privacy in his apartment hallway. . . . [But] Whitaker's lack of a reasonable expectation of complete privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public." (Citation omitted.) *United States* v. *Whitaker*, supra, 820 F.3d 853.

Even more recently, in *United States* v. *Hopkins*, 824 F.3d 726, 729, 731–33 (8th Cir. 2016), cert. denied, U.S.         (85 U.S.L.W. 3260, November 28, 2016), the Eighth Circuit Court of Appeals considered the closely related question of whether a canine sniff of the front door of a two-story townhouse violated the fourth amendment as interpreted in *Jardines* and *Kyllo*. In *Hopkins*, the townhouse in question shared a common walkway and front stoop with the unit next door. See id., 729–30. Unlike the court in *Whitaker*, which applied

*Katz*' reasonable expectation of privacy test, the Eighth Circuit followed the trespass to property approach utilized in *Jardines*. See id., 731–33. In doing so, the court explained that, under *Jardines*, "the front porch area [is] a classic exemplar of curtilage, the area immediately surrounding and associated with the home. . . . Although . . . officers [have] an implicit license to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave, they [have] no invitation to introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." (Citation omitted; internal quotation marks omitted.) Id., 731. The court then explained that a determination of "whether a particular area is part of the curtilage of an individual's residence requires consideration of [four] factors that bear [on] whether an individual reasonably may expect that the area in question should be treated as the home itself." (Internal quotation marks omitted.) Id. Those factors, which are set forth in *United States* v. *Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987), include "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." (Internal quotation marks omitted.) *United States* v. *Hopkins*, supra, 731.

Citing the canine handler's testimony that the dog had come within "six to eight inches" of the door and "actually sniffed the creases of the door"; (internal quotation marks omitted) id., 732; and noting that "[t]he area within [one] foot of the only door to the [townhouse] would be used every day by its residents as they came and went"; id.; the court concluded that the first and third *Dunn* factors were met and, therefore, that the area in question was curtilage. See id. The court did determine that the second and fourth *Dunn* factors were not met, but it noted that the same was true in *Jardines*, and the United States Supreme Court still determined that the front porch in that case was curtilage. See id.

Because we address the state's claim under the state constitution, we need not decide whether a canine sniff of an apartment door inside a multiunit building violates the fourth amendment. In the absence of significant precedent to the contrary of which we are unaware, however, and despite conflicting court decisions, we agree with the defendant that the better reasoned federal case law concerning the propriety of residential canine sniffs under the fourth amendment supports the defendant's position in this case. This is true whether the defendant's claim is reviewed under the *Katz* line of privacy based decisions or under the principles of curtilage on which the court in *Jardines* relied and that

the Eighth Circuit applied in *Hopkins*.

The state cites several federal cases for the proposition that the canine sniff of the defendant's front door was not a search because "there 'exists no generalized expectation of privacy in the common areas of an apartment building,' which [include] a 'common hallway.' "[12] "This jurisprudence," the state argues, "is consistent with United States Supreme Court decisions that have accorded apartments the status of 'homes' for fourth amendment purposes, but not the 'adjoining common hallways.' *United States* v. *Holland*, 755 F.2d 253, 255 (2d Cir.), cert. denied, 471 U.S. 1125 [105 S. Ct. 2657, 86 L. Ed. 2d 274] (1985)."

We agree with the trial court that the state's reliance on these cases, most of which predate both *Jardines* and *Kyllo*, is misplaced because all of them involve searches of the common areas themselves, or arrests made in those areas, rather than searches of apartments using the common areas as a place from which to launch a search. See, e.g., *United States* v. *Holland*, supra, 755 F.2d 255–57 (defendant's arrest in common vestibule of apartment building was lawful because defendant had no reasonable expectation of privacy in that area); *United States* v. *Kelly*, 551 F.2d 760, 763 (8th Cir.) (evidence found under common stairwell of apartment building was admissible at trial because defendant had no reasonable expectation of privacy in that area), cert. denied, 433 U.S. 912, 97 S. Ct. 2981, 53 L. Ed. 2d 1097 (1977), and cert. denied sub nom. *Powell* v. *United States*, 433 U.S. 912, 97 S. Ct. 2981, 53 L. Ed. 2d 1097 (1977).[13] The issue the courts were required to determine in these cases was simply whether the defendant's expectation of privacy in the common areas was sufficient to require that the police obtain a warrant prior to entering or conducting a search of those areas. *Holland*, a Second Circuit case cited throughout the state's brief, illustrates why the state's reliance on these cases is unwarranted.

In *Holland*, a police officer rang the doorbell for the apartment occupied by the defendant, Mose Holland, from "the ground floor entranceway" to the building's common hallway, and, when Holland arrived in the vestibule and opened the door, the police officer drew his gun and arrested him. *United States* v. *Holland*, supra, 755 F.2d 254. The Second Circuit Court of Appeals declined "to treat this as a 'threshold' case"; instead, the court assumed that the arrest "took place in the vestibule or hallway . . . ." Id., 255. In concluding that the arrest was lawful, the court relied on the "[commonsense] distinction between places of abode, such as apartments, and common hallways," which "are not within an individual tenant's zone of privacy . . . ." Id. That the state relies on *Holland* is curious in light of the Second Circuit's nearly simultaneous ruling in *United States* v. *Thomas*, supra, 757 F.2d 1367, that

a canine sniff of a person's front door in a multiunit apartment building *is* indeed a search because of the heightened expectation of privacy in the home. Therefore, the Second Circuit's jurisprudence distinguishes between the invasion of a common area itself and the use of a common area to invade an adjacent private area. As that court aptly recognized, a person may lack a reasonable expectation of privacy in the common areas of an apartment building without sacrificing the privacy interest inherent in his home. See id.

The state also cites three federal district court cases that conclude that a canine sniff of the hallway adjacent to an apartment in a multiunit apartment building is not a search, in part because the resident lacked a reasonable expectation of privacy in the common areas of the building. See *United States* v. *Mathews*, United States District Court, Docket No. 13-79 (ADM/AJB) (D. Minn. October 25, 2013) ("[b]ecause they are shared by multiple tenants, no reasonable expectation of privacy arises in such common areas"), aff'd on other grounds, 784 F.3d 1232 (8th Cir. 2015); *United States* v. *Penaloza-Romero*, United States District Court, Docket No. 13-36 (RHK/TNL) (D. Minn. September 30, 2013) ("[T]he dog sniff occurred in a common hallway of an apartment building. Without an expectation of privacy in the hallway, it cannot have the same constitutional protections as the curtilage around a house."); *United States* v. *Broadway*, 580 F. Supp. 2d 1179, 1193 (D. Colo. 2008) ("[The] [d]efendant argues [that the apartment building groundskeeper] did not have the authority to allow [the police detective] into the secure hallway. . . . '[A] tenant lacks a reasonable expectation of privacy in the common areas of an apartment building.' "). For a number of reasons, these cases are unpersuasive. First, two of them are from the Eighth Circuit, which has explicitly reserved judgment on the application of *Jardines* to apartments in multiunit buildings. See *United States* v. *Mathews*, 784 F.3d 1232, 1235 (8th Cir.) (declining to reach question of whether *Jardines* "cast[s] doubt on . . . earlier cases [in the Eighth Circuit] sanctioning the use of a drug dog to sniff around the door of an apartment in the common hallway of an apartment building . . . because it was objectively reasonable at the time for police to rely on binding circuit precedent permitting such drug dog sniffs," and, under *Davis* v. *United States*, 564 U.S. 229, 232, 131 S. Ct. 2419, 180 L. Ed. 2d 285 [2011], "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule" [internal quotation marks omitted]), cert. denied sub nom. *Matthews* v. *United States*, U.S. , 136 S. Ct. 376, 193 L. Ed. 2d 303 (2015). Furthermore, insofar as the court in *Broadway* addressed the issue, that court determined simply that a tenant could not reasonably expect police officers not to be present in the common hallway in question. See *United States* v. *Broadway*, supra, 1194

("[i]f actual authority is established, the person whose property is searched is unjustified in claiming an expectation of privacy in the property because that person cannot reasonably believe that the joint user will not, under certain circumstances, allow a search in her own right" [internal quotation marks omitted]). In *Broadway*, a detective was admitted into an apartment complex by a groundskeeper who had at least apparent authority to do so, and the court determined that the groundskeeper's consent vitiated any expectation of privacy on the part of the defendant. See id.; see also *United States* v. *Brock*, 417 F.3d 692, 697 (7th Cir. 2005) ("[c]ritical to our holding that the dog sniff in this case was not a [f]ourth [a]mendment search is the fact that [the] police were lawfully present inside the common areas of the residence with the consent of [the defendant's] roommate"). As we observed previously, however, the question of lawful physical presence is distinct from the question of whether a canine sniff of the exterior of a person's home impermissibly invades reasonable expectations of privacy in the home.

The state also argues that the canine sniff was not a search under the state constitution because the defendant had no reasonable expectation of privacy in any contraband inside his condominium. Relying on the reasoning of *United States* v. *Place*, supra, 462 U.S. 707, and *United States* v. *Caballes*, supra, 543 U.S. 408–409, that the canine sniffs at issue in those cases were not searches for purposes of the fourth amendment because a canine sniff reveals only contraband in which an individual has no legitimate expectation of privacy, the state maintains that this logic applies equally to the present case. The state also observes that *Place* and *Caballes* are in no way inconsistent with or undermined by *Kyllo*, for, as the court itself explained in *Caballes*, "[c]ritical to [this court's] decision [in *Kyllo*] was the fact that the [thermal imaging] device was capable of detecting lawful activity"; id.; and "[t]he legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from [an individual's] hopes or expectations concerning the nondetection of contraband in the trunk of his car." Id., 410.[14] According to the state, because a canine sniff reveals only contraband, it is not a search, even if it is directed at the home.

Although we ultimately disagree with the state's contention that the present case is controlled by *Place* and *Caballes*, we acknowledge that the state's fourth amendment analysis does find support in a number of federal and sister state cases. These cases hold that, whatever the extent of privacy rights otherwise pertaining to common hallways in multitenant buildings, a canine sniff of an apartment building or other residence is not a search because it discloses only the existence of contraband.[15] See, e.g., *United States* v. *Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010), cert. denied,

562 U.S. 1160, 131 S. Ct. 964, 178 L. Ed. 2d 794 (2011); *United States* v. *Brock*, supra, 417 F.3d 696; *United States* v. *Anthony*, United States District Court, Docket No. 11-68 (JBS) (D.N.J. March 20, 2012); *United States* v. *Broadway*, supra, 580 F. Supp. 2d 1190; *State* v. *Nguyen*, 841 N.W.2d 676, 681 (N.D. 2013), cert. denied, U.S.    , 135 S. Ct. 2888, 192 L. Ed. 2d 924 (2015). Although the continued vitality of the reasoning of the Seventh and Eighth Circuit cases has been called into question by subsequent decisions of those courts; see *United States* v. *Hopkins*, supra, 824 F.3d 731–33 (Eighth Circuit Court of Appeals); *United States* v. *Whitaker*, supra, 820 F.3d 852–54 (Seventh Circuit Court of Appeals); several other cases generally support the state's argument. For example, as the court in *Anthony* explained: "The legal premise that governmental conduct that only reveals the possession of contraband compromises no legitimate privacy interest . . . is not, on its face, a [fact specific] judgment with respect to cars or luggage—or really even a judgment about privacy expectations; it is a judgment about the legitimacy of hiding contraband. From this perspective, there is no reason why governmental conduct that only reveals the possession of contraband in a house should be different from governmental conduct that only reveals the possession of contraband in the trunk of a car, because the reason for not affording contraband [f]ourth [a]mendment privacy protection has nothing to do with expectations of what will remain private, and everything to do with what society is prepared to accept as legitimate privacy." (Internal quotation marks omitted.) *United States* v. *Anthony*, supra. Consistent with this reasoning, the court concluded that a canine sniff of an apartment from the hallway of a multifamily residence, at least when "nothing in the record calls into question the factual premise that nothing is revealed other than possession of contraband by a dog sniff," is not a search under the fourth amendment. Id.; see also *United States* v. *Broadway*, supra, 1191 ("as long as the canine unit is lawfully present when the sniff occurs, the canine sniff is not a search within the meaning of the [f]ourth [a]mendment" [internal quotation marks omitted]).

We acknowledge that, in *Place* and, more recently, in *Caballes*, the United States Supreme Court employed reasoning that supports the conclusion that a canine sniff is not a search under the fourth amendment because that investigative technique reveals only the existence of contraband, and one's subjective expectation of privacy in contraband is not objectively reasonable. See *Illinois* v. *Caballes*, supra, 543 U.S. 408–10 (canine sniff of motor vehicle does not implicate fourth amendment because there can be no expectation of privacy in contraband that society deems reasonable); *United States* v. *Place*, supra, 462 U.S. 707 (canine sniff of luggage at public airport is not search within meaning

of fourth amendment, in part because it discloses only presence or absence of contraband). Nevertheless, we believe that *Place* and *Caballes* are distinguishable from the present case because a canine sniff of a residence is entitled to significantly more protection than a canine sniff of an automobile or a piece of luggage at a public airport. Both this court and the United States Supreme Court have drawn a bright line around the home. Indeed, the United States Supreme Court has held "over and over again . . . that people's expectations of privacy are much lower in their cars than in their homes"; *Florida* v. *Jardines*, supra, 133 S. Ct. 1419 n.1 (Kagan, J., concurring); and, as the Second Circuit Court of Appeals observed in *Thomas*, "[a] practice that is not intrusive in a public airport may be intrusive when employed at a person's home." *United States* v. *Thomas*, supra, 757 F.2d 1366. This is because "[t]he very fact that a person is in his own home raises a reasonable inference that he intends to have privacy, and if that inference is borne out by his actions, society is prepared to respect his privacy." Id., quoting *United States* v. *Taborda*, 635 F.2d 131, 138 (2d Cir. 1980). Indeed, this respect for the sanctity of the home is at the "very core" of the fourth amendment; (internal quotation marks omitted) *Florida* v. *Jardines*, supra, 1414; and is "well established . . . in our [state's] jurisprudence." *State* v. *Geisler*, supra, 222 Conn. 687; see also *State* v. *Bernier*, 246 Conn. 63, 75, 717 A.2d 652 (1998) ("the right to be secure in one's home is central to the prohibition of article first, § 7, of the state constitution, against unreasonable intrusions by the state"); *State* v. *Brown*, supra, 198 Conn. 356–57 ("[p]rivacy expectations are normally highest and are accorded the strongest constitutional protection in the case of a private home and the area immediately surrounding it").

Furthermore, this distinction between searches of the home and searches of locations outside the home is consistent with the established priorities of article first, § 7, of the Connecticut constitution. As we noted in *State* v. *Miller*, supra, 227 Conn. 363, Connecticut has long had a "strong policy in favor of warrants" under article first, § 7, a policy that has been held to "[provide] broader protection than the fourth amendment" in certain contexts. Id., 382. Indeed, "[u]nder the state constitution, all warrantless searches, [regardless of] whether . . . the police have probable cause to believe that a crime was committed, are per se unreasonable, unless they fall within one of a few specifically established and well delineated exceptions to the warrant requirement." *State* v. *Joyce*, 229 Conn. 10, 24–25, 639 A.2d 1007 (1994). In *Joyce*, we explained that the few "recognized exceptions" arise out of "acknowledged interests in protecting the safety of the police and the public and in preserving evidence." (Internal quotation marks omitted.) Id., 26. Suffice it to say that the use of a canine sniff for drugs in response to an

anonymous tip will rarely, if ever, rise to the level of urgency required by these precedents.

Thus, we agree with the Seventh and Second Circuits that a resident's legitimate expectation of privacy in the home is capacious enough to preclude certain uses of the common areas immediately adjacent to the home. As the Seventh Circuit explained, the defendant's "lack of a right to exclude did not mean [that] he had no right to expect certain norms of behavior in his apartment hallway. [To be sure], other residents and their guests (and even their dogs) can pass through the hallway. They are not entitled, though, to set up chairs and have a party in the hallway right outside the door. Similarly, the fact that a police officer might lawfully walk by and hear loud voices from inside an apartment does not mean [that] he could put a stethoscope to the door to listen to all that is happening inside." *United States* v. *Whitaker*, supra, 820 F.3d 853.

In other words, a defendant's "lack of a reasonable expectation of complete privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public." Id.; see also *United States* v. *Thomas*, supra, 757 F.2d 1367 (finding "a legitimate expectation that the contents of [a] closed apartment would remain private, that they could not be 'sensed' from outside [the] door"). This is consonant with the United States Supreme Court's observation that the right to retreat into one's home "would be of little practical value if the [s]tate's agents could stand in a home's porch or side garden and trawl for evidence with impunity" or "if the police could enter a man's property to observe his repose from just outside the front window." *Florida* v. *Jardines*, supra, 133 S. Ct. 1414.

Indeed, even if a canine sniff were to reveal nothing about the interior of the home, we believe that the underlying prohibition against unreasonable intrusions into the sanctity of the home cannot abide the public spectacle of a warrantless canine investigation of the perimeters of any home. It may well be that a canine sniff itself is "discriminating and unoffensive" when compared to other physical intrusions of the premises of a home. *United States* v. *Thomas*, supra, 757 F.2d 1367. Even so, such searches are highly visible and readily identifiable. They also hold a resident up to public scrutiny in his own home. As the Florida Supreme Court observed, "[s]uch a public spectacle unfolding in a residential neighborhood will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident, for such dramatic government activity in the eyes of many—neighbors, passers-by, and the public at large—will be viewed as an official accusation of crime." *Jardines* v. *State*, 73 So. 3d 34, 36 (Fla. 2011), aff'd,      U.S.      , 133 S. Ct. 1409,

185 L. Ed. 2d 495 (2013).[16] We also share that court's concern that, if police officers are permitted to conduct warrantless canine searches of people's homes, "there is nothing to prevent [them] from applying the procedure in an arbitrary or discriminatory manner, or based on whim and fancy, at the home of any citizen," and that "[s]uch an open-ended policy invites overbearing and harassing conduct." Id.

In view of the foregoing, we agree with those federal courts that have distinguished canine sniffs of the home from canine sniffs of movable property. While we have previously suggested that the "heightened privacy interests that pertain to one's house" might demand a more rigorous assessment of canine sniffs than the privacy interests in movable property; see *State* v. *Waz*, supra, 240 Conn. 381; we believe that Justice Kagan's concurrence in *Jardines* properly applies this principle to the "[super sensitive] instrument" of a dog's nose. *Florida* v. *Jardines*, supra, 133 S. Ct. 1418 (Kagan, J., concurring). As Justice Kagan observed, the sanctity of the home is not measured by the presence or absence of contraband, or even by the relative "intimacies" of the facts that may be discovered there. Id. Rather, it is measured by the " 'firm' " and " 'bright' " line at the entrance to the house. Id., 1419 (Kagan, J., concurring). Considered in this light, cases such as *Caballes* are not simply cases about canine sniffs; they are cases about canine sniffs *directed at motor vehicles*. See *Illinois* v. *Caballes*, supra, 543 U.S. 417 (Souter, J., dissenting) (noting that majority in *Caballes* did "not go so far as to say explicitly that sniff searches by dogs trained to sense contraband always get a free pass under the [f]ourth [a]mendment, since it reserve[d] judgment on the constitutional significance of sniffs assumed to be more intrusive than a dog's walk around a stopped car"). Significantly, this interpretation of *Caballes* has been adopted by the only federal circuit court of appeals to have considered the issue of canine sniffs in a common hallway after *Jardines*. See *United States* v. *Whitaker*, supra, 820 F.3d 853; see also *United States* v. *Davis*, 760 F.3d 901, 905 (8th Cir. 2014) (questioning continuing validity of earlier circuit precedent to contrary following *Jardines*), cert. denied,    U.S.   , 135 S. Ct. 996, 190 L. Ed. 2d 872 (2015).

Turning to precedent from other state courts, we note that only seven states appear to have addressed the issue of whether a canine sniff of an apartment door in a multiunit building is a search with constitutional implications. Five have concluded, either under the federal constitution or their respective state constitutions, that it is a search and that it requires either a reasonable, articulable suspicion or a warrant supported by probable cause. See *People* v. *Burns*, 50 N.E.3d 610, 613–14, 622 (Ill. 2016) (under *Jardines*, canine sniff of apartment door in multiunit apartment building is search under fourth amendment requiring warrant supported

by probable cause); *State* v. *Davis*, 732 N.W.2d 173, 181 (Minn. 2007) (under Minnesota constitution, "the police needed a reasonable, articulable suspicion to walk a [narcotics detection] dog down the common hallway outside [the defendant's] apartment"); *State* v. *Ortiz*, 257 Neb. 784, 787, 600 N.W.2d 805 (1999) (under federal and Nebraska constitutions, "[a]lthough a canine may be deployed to test for illegal drugs in some cases, doing so at the threshold of [any] dwelling on less than reasonable, articulable suspicion is improper"); *People* v. *Dunn*, 77 N.Y.2d 19, 25, 564 N.E.2d 1054, 563 N.Y.S.2d 388 (1990) (New York constitution requires reasonable, articulable suspicion before police may employ canine sniff of apartment door in multiunit apartment building), cert. denied, 501 U.S. 1219, 111 S. Ct. 2830, 115 L. Ed. 2d 1000 (1991); *State* v. *Rendon*, 477 S.W.3d 805, 808 (Tex. Crim. App. 2015) (under *Jardines*, "the officers' conduct in bringing a trained [drug detection] dog up to the threshold or area immediately outside of [the defendant's apartment] door for the purpose of conducting a [canine narcotics] sniff was an 'unlicensed physical intrusion' onto the curtilage of his home that constituted a search in violation of the [f]ourth [a]mendment").

In addition, the Florida Supreme Court and Washington Court of Appeals both have concluded that a canine sniff of the front door of a single-family home violates the resident's reasonable expectation of privacy in his home and therefore requires a warrant supported by probable cause. See *Jardines* v. *State*, supra, 73 So. 3d 36, 49, 54; *State* v. *Dearman*, 92 Wn. App. 630, 631, 637, 962 P.2d 850 (1998), review denied, 137 Wn. 2d 1032, 980 P.2d 1286 (1999). Because these courts based their rulings on the reasonable expectation of privacy test recognized in *Katz*, their holdings logically would extend to all residences within their states. The Indiana Court of Appeals has similarly concluded that a canine sniff of a residence requires only a reasonable and articulable suspicion. See *Hoop* v. *State*, 909 N.E.2d 463, 468–71 (Ind. App. 2009), transfer denied, 929 N.E.2d 782 (Ind. 2010). Although "Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure"; (internal quotation marks omitted) id., 468; the court emphasized as central to its holding "the need to restrict arbitrary selection of persons to be searched . . . ." Id., 470. If anything, such concerns are exacerbated by the presence of many dwellings in close proximity, as in an apartment complex. As a result, we suspect Indiana also would apply the reasonable suspicion requirement to residences within a multiunit building.

Finally, several state appellate courts have determined that even a canine sniff of a nonresidential property may be a search under their respective state constitutions and may require a reasonable, articulable suspicion. In Alaska, a canine sniff of a commercial

warehouse requires a reasonable and articulable suspicion; *McGahan* v. *State,* 807 P.2d 506, 510–11 (Alaska App. 1991); as does the canine sniff of an individual storage locker from a public hallway located in a storage facility in Pennsylvania. *Commonwealth* v. *Johnston,* 515 Pa. 454, 457–58, 465–66, 530 A.2d 74 (1987). A handful of states also extend this protection to private vehicles under their respective state constitutions. See *State* v. *Tackitt,* 315 Mont. 59, 69–70, 67 P.3d 295 (2003); *State* v. *Pellicci,* 133 N.H. 523, 533, 580 A.2d 710 (1990); *Commonwealth* v. *Rogers,* 578 Pa. 127, 134–37, 849 A.2d 1185 (2004). In light of the heightened privacy interests surrounding a person's home, it is safe to assume that, in these states, a canine sniff of a private residence would require at least a reasonable and articulable suspicion.

In the other column, we are aware of only two state appellate courts that have concluded that a canine sniff of an apartment door in a multiunit building is not a search for fourth amendment purposes.[17] See *Lindsey* v. *State,* 226 Md. App. 253, 274, 127 A.3d 627 (2015) (because common area adjacent to apartment door is not curtilage and resident has no reasonable expectation of privacy in that common area, canine sniff conducted from common area is not search under fourth amendment), cert. dismissed, 447 Md. 299, 135 A.3d 417 (2016); *State* v. *Nguyen,* supra, 841 N.W.2d 681 (canine sniff of common hallway adjacent to apartment door was not search because there is no reasonable expectation of privacy in contraband and common hallway is not curtilage). In *Lindsey,* the Maryland Court of Special Appeals concluded that the common area outside of an apartment door, which is where the canine search was conducted, did not constitute curtilage because the defendant, Shaun D. Lindsey, could not maintain "some form of exclusive control" over the area.[18] (Emphasis omitted.) *Lindsey* v. *State,* supra, 280. Because Lindsey lacked exclusive control over who entered and used the common area, the court also concluded that he did not have a reasonable expectation of privacy in that area. See id. We are not persuaded by *Lindsey,* however, because, even if we agreed with that court's conclusion that the common area is not curtilage, we disagree with the court's reasonable expectation of privacy analysis insofar as it is predicated on the officers' lawful presence in the common area rather than on the canine sniff of the apartment that was conducted from that common area.

In *Nguyen,* the North Dakota Supreme Court held, first, that the technical trespass of police officers in the common hallways of an apartment building "[was] of no consequence because [the defendant, Matthew D.] Nguyen, had no reasonable expectation that the common hallways of the apartment building would be free from any intrusion." *State* v. *Nguyen,* supra, 841 N.W.2d 681. For essentially the same reason, the court further

determined that the common hallway was not curtilage: "Having determined that, unlike the area immediately surrounding a home, a party does not have a legitimate expectation of privacy in the common hallways and shared spaces of an apartment building, [the court] conclude[s] [that] the common hallway is not an area within the curtilage of Nguyen's apartment." Id., 682. Finally, with respect to Nguyen's expectation of privacy inside his apartment, the court, in reliance on *Place* and its progeny, held that any such expectation did not reasonably extend to the contraband to which the trained narcotics detection dog alerted. See id., 681–82.[19] For the foregoing reasons, we believe that, because an individual's privacy interests are greatest in his or her home, the court in *Nguyen* incorrectly equated a nonconsensual governmental intrusion into the home with a similar intrusion into a motor vehicle or a piece of luggage at a public airport. In any event, it appears that the weight of sister state precedent supports the view that the canine sniff of the defendant's door in the present case was a search under our constitution.

Finally, we perceive no principled reason of public policy, and the state has identified none, why, in the context of canine sniffs, the firm and bright line that we draw at the entrance of the house should apply to single-family dwellings but not to dwellings in a multiunit building. Indeed, as the Seventh Circuit observed in *Whitaker*, allowing police dogs to sniff the doors of apartments but not freestanding homes would be deeply "troubling because it would apportion [constitutional] protections on grounds that correlate with income, race, and ethnicity. For example, according to the [United States Census Bureau's] American Housing Survey for 2013, 67.8 [percent] of households composed solely of whites live in [one unit] detached houses. For households solely composed of blacks, that number dropped to 47.2 [percent]. And for Hispanic households, that number was 52.1 [percent]. The percentage of households that live in [single unit], detached houses consistently rises with income. At the low end, 40.9 [percent] of households that earned less than $10,000 lived in [single unit], detached houses, and, at the high end, 84 [percent] of households that earned more than $120,000 did so."[20] *United States* v. *Whitaker*, supra, 820 F.3d 854. For this important reason, we believe that public policy strongly favors the state constitutional interpretation advocated by the defendant in the present case.

Accordingly, we are unable to agree with the state that all canine sniffs are constitutionally innocuous. Rather, for the reasons previously discussed in this opinion, we conclude that a canine sniff directed toward a home—whether freestanding or part of a multitenant structure—is a search under article first, § 7, and, as such, requires a warrant issued upon a court's finding of probable cause.[21] We therefore conclude that the

defendant was entitled to the suppression of the evidence seized from his residence as the fruit of the unlawful canine sniff.

IV

RESPONSE TO THE CONCURRING JUSTICE

In his concurring opinion, Justice Zarella contends that we should have decided this case under the federal constitution rather than under the state constitution. In support of this contention, he states that, as a general matter, "the proper mode of analysis [in a case involving claims under both the federal and state constitutions] should be to address the federal claim first, turning to the state constitutional claim only after determining that the federal constitution does not provide a basis for relief or if the applicable federal rule is truly unsettled." Because Justice Zarella concludes that the defendant in the present case prevails under settled fourth amendment principles, he asserts that we have no cause to consider the defendant's state constitutional claim. We agree with Justice Zarella that we turn first to the state constitutional claim when the issue is unsettled under the federal constitution or, if it is settled under the federal constitution, when the defendant is not entitled to relief thereunder. Cf. *State* v. *Santiago*, 318 Conn. 1, 13 n.11, 122 A.3d 1 (2015). Ordinarily, if the issue has been definitively resolved under the federal constitution, and settled law clearly supports the view advanced by the defendant, there is little reason to undertake the kind of searching and painstaking analysis that invariably will be necessary to resolve a state constitutional issue of first impression raised on appeal.[22] On the other hand, if the federal constitution does not clearly and definitively resolve the issue in the defendant's favor, we turn first to the state constitution to ascertain whether its provisions entitle the defendant to relief.[23] After all, as the ultimate arbiter of the state constitution, this court's interpretation of that constitution is final and conclusive, whereas we "can give only an informed guess of the meaning of the [f]ederal [c]onstitution."[24] D. Braithwaite, "An Analysis of the 'Divergence Factors': A Misguided Approach to Search and Seizure Jurisprudence Under the New Jersey Constitution," 33 Rutgers L.J. 1, 35 (2001–2002); see also, e.g., *State* v. *Joyce*, supra, 229 Conn. 15–16 n.6 (when issue is not settled under federal constitution, we turn to state constitution rather than speculating as to how issue would be resolved under provisions of federal constitution).[25]

We disagree, however, that federal case law definitively resolves the issue presented by this appeal. As we have indicated, only two federal appeals courts have determined that the use of a canine sniff at a home is a search for purposes of the fourth amendment, and the case on which Justice Zarella primarily relies, *United States* v. *Thomas*, supra, 757 F.2d 1367, has been criticized by a significant number of federal courts.[26] See,

e.g., *United States* v. *Reed*, 141 F.3d 644, 649–50 (6th Cir. 1998) (rejecting reasoning of *Thomas* and explaining that *Thomas* has not been followed by other courts); *United States* v. *Lingenfelter*, 997 F.2d 632, 638 (9th Cir. 1993) (declining to follow *Thomas* and observing that "*Thomas* has been rightfully criticized"); *United States* v. *Colyer*, 878 F.2d 469, 475 (D.C. Cir. 1989) (questioning reasoning of *Thomas* as incompatible with United States Supreme Court cases involving canine sniffs); *United States* v. *Cota-Lopez*, 358 F. Supp. 2d 579, 592 (W.D. Tex. 2002) (rejecting *Thomas* as contrary to United States Supreme Court precedent), aff'd, 104 Fed. Appx. 931 (5th Cir. 2004); *United States* v. *Hogan*, 122 F. Supp. 2d 358, 369 (E.D.N.Y. 2000) ("*Thomas* . . . has been criticized by several other circuit courts. Those courts have pointed out that the rationale underlying the *Thomas* decision conflicts with the underpinnings of the [United States] Supreme Court's holding that the canine sniff in *Place* did not constitute a search. . . . *Thomas* thus appears to be at odds with [Supreme Court precedent]. . . . Although *Thomas* remains the law in [the Second] [C]ircuit, the foregoing discussion suggests that it should not be applied expansively." [Citations omitted.]).[27]

As this criticism of *Thomas* reflects, the United States Supreme Court has never retreated from its reasoning in *Place*, namely, that a canine sniff of luggage at a public airport is not a search for fourth amendment purposes because that investigative technique reveals only contraband in which the subject of the investigation has no legitimate expectation of privacy. See, e.g., *United States* v. *Jacobsen*, 466 U.S. 109, 124 n.24, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) ("the reason [the *Place* canine sniff] did not intrude [on] any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items" [emphasis omitted]). In fact, as we noted previously, in *Illinois* v. *Caballes*, supra, 543 U.S. 405, the court relied on the very same reasoning that it had employed in *Place*, concluding that a canine sniff of a motor vehicle, like a canine sniff of luggage at a public airport, "does not rise to the level of a constitutionally cognizable infringement"; id., 409; because "governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest." (Emphasis in original; internal quotation marks omitted.) Id., 408. Of course, the rationale that canine sniffs reveal only the existence of contraband is no less applicable to *any* canine sniff, including the sniff at issue in the present case. Until the United States Supreme Court decides whether the reasoning of *Place* and *Caballes* applies with equal force to a canine sniff of a home, it is impossible to say with confidence that the federal constitution bars the warrantless canine sniff that occurred in the present case. See, e.g., *State* v. *Guillen*, 222 Ariz. 81, 85, 213 P.3d 230 (App. 2009) (characterizing

this issue as presenting "a vexingly close question"), vacated on other grounds, 223 Ariz. 314, 223 P.3d 658 (2010); see also *State* v. *Guillen*, 223 Ariz. 314, 319, 223 P.3d 658 (2010) (observing that "the case law on dog sniffs of the exterior of a residence accessible to the public is far from clear" and that "cases from other jurisdictions are split on whether dog sniffs of the exterior of a residence violate the [f]ourth [a]mendment or their respective state constitutions").[28] Thus, contrary to Justice Zarella's contention, the fact that the Second Circuit Court of Appeals decided the federal constitutional issue in favor of the defendant some three decades ago in *Thomas*—many years before the seminal cases of *Jardines*, *Caballes* and *Kyllo* were decided— by no means suggests that the law is truly settled under the fourth amendment.[29]

This lack of clarity surrounding the propriety of the use of a warrantless canine sniff at the door of a residence under the federal constitution is further demonstrated by the positions taken by the current members of the United States Supreme Court on this precise issue in *Jardines*. As we discussed previously, the majority in *Jardines*, which was comprised of Justices Scalia (the authoring justice), and Justices Thomas, Ginsburg, Sotomayor, and Kagan, concluded that the canine sniff conducted at the base of Jardines' front door was a search under the fourth amendment because the sniff took place in the curtilage of the home. See *Florida* v. *Jardines*, supra, 133 S. Ct. 1417–18. In a concurrence joined by Justices Ginsburg and Sotomayor, but not Justices Scalia and Thomas, Justice Kagan expressed the view that the canine sniff also violated Jardines' reasonable expectation of privacy, and, for that reason as well, the sniff constituted a search protected by the fourth amendment. See id., 1418 (Kagan, J., concurring). Justice Alito, joined by Chief Justice Roberts and Justices Kennedy and Breyer, dissented. Id., 1420 (Alito, J., dissenting). In concluding that the canine sniff at Jardines' front door was not a search for fourth amendment purposes, Justice Alito rejected *both* the majority's curtilage rationale *and* Justice Kagan's reasonable expectation of privacy rationale.[30] Id., 1424, 1426 (Alito, J., dissenting).

To summarize, four current members of the court— Chief Justice Roberts and Justices Kennedy, Breyer and Alito—have concluded that a canine sniff at the front door of a home is not a search that implicates the fourth amendment because, inter alia, the sniff does not violate the home owner's reasonable expectation of privacy. Three members of the court—Justices Ginsburg, Sotomayor and Kagan—take a contrary view. Justice Thomas, the remaining member of the court who also participated in *Jardines*, took no position on whether the canine sniff violated Jardines' reasonable expectation of privacy. Thus, four current members of the court would decide the present case *against* the defendant

on federal constitutional grounds, three current members of the court would decide the present case *in favor* of the defendant on federal constitutional grounds, and one current member of the court has taken no express position on the issue. Even if we were to assume that Justice Thomas' decision not to join Justice Kagan's concurrence reveals nothing about his view on the matter, more current members of the court are on record as concluding that a canine sniff at the front door of a home is *not* a search and, consequently, does not violate the fourth amendment. Accordingly, we reject Justice Zarella's assertion that the defendant clearly prevails under the federal constitution because, in fact, we simply have no idea how a majority of the members of the United States Supreme Court would decide the issue. Although we believe that the more persuasive lower court precedent weighs in favor of our conclusion in this case, it can hardly be said that the issue is a settled one.

The judgment is affirmed.

In this opinion ROGERS, C. J., and McDONALD, ROBINSON and VERTEFEUILLE, Js., concurred.

* December 22, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[2] The state appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The defendant also claims, as the trial court concluded, that the canine sniff of his residence violated the fourth amendment's prohibition against unreasonable searches and seizures. We recently have explained that when the issue presented is one of first impression under both the state and federal constitutions, it is appropriate to consider the state constitutional claim first, "turning to the federal claim only after determining that the appellant's state constitutional [challenge] will not succeed." *State* v. *Santiago*, 318 Conn. 1, 16 n.11, 122 A.3d 1 (2015). As we discuss more fully in part IV of this opinion, we see no reason to deviate from this approach when, as in the present case, the issue is not truly settled under the federal constitution, such that we cannot predict to a reasonable degree of certainty how the United States Supreme Court would resolve the issue. See, e.g., *State* v. *Joyce*, 229 Conn. 10, 16 n.6, 639 A.2d 1007 (1994) ("we need not speculate whether the defendant's expectation of privacy . . . would be reasonable under the fourth amendment, because the defendant invokes the state constitution as well as the federal constitution").

[4] We note that the state makes no claim either that the Berlin police had a reasonable and articulable suspicion that the defendant's condominium unit contained marijuana or that such a level of suspicion would suffice to render the canine sniff lawful without a warrant predicated on probable cause.

[5] As the court in *Caballes* explained, "[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the [f]ourth [a]mendment. . . . [The court has] held that any interest in possessing contraband cannot be deemed legitimate, and thus . . . governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest. . . . This is because the expectation that certain facts will not come to the attention of the authorities is not the same as an interest in privacy that society is prepared to consider reasonable. . . . In [*Place*, the court] treated a canine sniff by a [well trained narcotics detection] dog as *sui generis* because it discloses only the presence or absence of narcotics, a contraband item." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Illinois* v. *Caballes*, supra, 543

U.S. 408–409.

[6] "[O]ur adoption of an analytical framework or methodology used under the federal constitution does not compel this court to reach the same outcome that a federal court might reach when the methodology is applied to a particular set of factual circumstances. Even when the state and [f]ederal [c]onstitutions contain the same [or similar] language and employ the same methodology to govern the interpretation and application of that language [as they do in the present case], the ultimate constitutional decision often will turn [on] a factual assessment of how society feels about certain matters or how society functions under various conditions. . . . In each instance it could matter greatly which society you are talking about: a privacy claim lacking the national consensus necessary to trigger federal constitutional protection might still enjoy local support strong enough to dictate state constitutional protection . . . ." (Internal quotation marks omitted.) *State* v. *Joyce*, 229 Conn. 10, 18 n.12, 639 A.2d 1007 (1994).

[7] As the United States Supreme Court has recently underscored, the fourth amendment protects against government infringement of an individual's reasonable expectation of privacy and also against the government's nonconsensual physical intrusion into a person's private property. See *Florida* v. *Jardines*, supra, 133 S. Ct. 1414 ("By reason of our decision in [*Katz*], property rights are not the sole measure of [f]ourth [a]mendment violations . . . . [Al]though *Katz* may add to the baseline, it does not subtract anything from the [fourth] [a]mendment's protections when the [g]overnment *does* engage in [a] physical intrusion of a constitutionally protected area . . . ." [Citations omitted; emphasis in original; internal quotation marks omitted.]). Thus, in *Jardines*, because the police officers "were gathering information in an area belonging to [the respondent, Joelis] Jardines and immediately surrounding his house," that is, in the curtilage of the house, an area that "enjoys protection as part of the home itself"; id.; that intrusion constituted a search under the fourth amendment. Id., 1417–18. Because we resolve the issue raised in the present case on the basis of the defendant's reasonable expectation of privacy under article first, § 7, of the state constitution, we need not address the defendant's alternative state constitutional claim that the police activity at issue was unlawful because it occurred in the curtilage of his condominium unit.

We note that, in *State* v. *Brown*, 198 Conn. 348, 503 A.2d 566 (1986), this court stated that, because a home owner has a reasonable expectation of privacy in the curtilage of the home, curtilage "does not provide a separate basis for fourth amendment protection," and "[t]he focus remains the reasonable expectation of privacy [that] an individual possesses in the area." Id., 359 n.9. We disavow this statement because it is inconsistent with the fourth amendment analysis employed by the United States Supreme Court in *Jardines*.

[8] Neither the language nor the history of article first, § 7, bears on our analysis. With respect to the latter consideration, we previously have observed that "the history of article first, § 7, sheds no light on the appropriate standard to be applied to a canine sniff because that investigative technique was unknown at the time our constitution was adopted in 1818." *State* v. *Waz*, supra, 240 Conn. 374 n.15.

[9] In reaching its determination in *Thomas*, the Second Circuit relied principally on "the heightened privacy interest that an individual has in his dwelling place." *United States* v. *Thomas*, supra, 757 F.2d 1366. Acknowledging that warrantless canine sniffs of baggage at a public airport had recently been held constitutional; see *United States* v. *Place*, supra, 462 U.S. 698; the court in *Thomas* explained that "a practice that is not intrusive in a public airport may be intrusive when employed at a person's home. Although using a dog sniff for narcotics may be discriminating and unoffensive relative to other detection methods, and will disclose only the presence or absence of narcotics . . . it remains a way of detecting the contents of a private, enclosed space. With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument. . . . [T]he defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be 'sensed' from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation." (Citation omitted.) *United States* v. *Thomas*, supra, 1366–67.

[10] Although the facts of *Jardines* are similar to the facts in the present

case in certain respects, as we explain more fully hereinafter, they are also materially different in at least two important respects. First, the canine sniff in *Jardines* was conducted on the front porch of a single-family house; see *Florida* v. *Jardines*, supra, 133 S. Ct. 1413; whereas the canine sniff in the present case occurred in the common hallway of a condominium complex. Second, the court in *Jardines* elected to decide the case on the basis of the property rights of the respondent, Joelis Jardines, as the owner and resident of the house. See id., 1417. In contrast, we resolve the present case on the basis of the defendant's reasonable expectation of privacy in his condominium unit.

[11] In light of its determination that the police officers had exceeded the scope of their invitation to enter Jardines' property, the court concluded that it did not need to "decide whether the officers' investigation of Jardines' home [also] violated his expectation of privacy under *Katz*." *Florida* v. *Jardines*, supra, 133 S. Ct. 1417. "One virtue of the [f]ourth [a]mendment's [property rights] baseline," the court explained, "is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." Id.

[12] See, e.g., *United States* v. *Elliot*, 50 F.3d 180, 186–87 (2d Cir. 1995) (no expectation of privacy that would preclude search of areas believed to be unleased when officers acted in reasonable reliance on property manager's consent), cert. denied, 516 U.S. 1050, 116 S. Ct. 715, 133 L. Ed. 2d 669 (1996); *United States* v. *Nohara*, 3 F.3d 1239, 1242–43 (9th Cir. 1993) (no reasonable expectation of privacy that would prevent officers from peeking around corner of hallway to spy on defendant); *United States* v. *Acosta*, 965 F.2d 1248, 1251–53 (3d Cir. 1992) (no reasonable expectation of privacy that would preclude officer's entry into apartment building); *United States* v. *Holland*, 755 F.2d 253, 255–57 (2d Cir.) (no reasonable expectation of privacy that would prevent arrest in vestibule of two-story, two apartment house), cert. denied, 471 U.S. 1125, 105 S. Ct. 2657, 86 L. Ed. 2d 274 (1985); *United States* v. *Arboleda*, 633 F.2d 985, 991–92 (2d Cir. 1980) (no legitimate expectation of privacy in bag of cocaine found on ledge near fire escape), cert. denied, 450 U.S. 917, 101 S. Ct. 1362, 67 L. Ed. 2d 343 (1981); *United States* v. *Kelly*, 551 F.2d 760, 763, 765 (8th Cir.) (no reasonable expectation of privacy in evidence found under common stairwell in apartment building), cert. denied, 433 U.S. 912, 97 S. Ct. 2981, 53 L. Ed. 2d 1097 (1977), and cert. denied sub nom. *Powell* v. *United States*, 433 U.S. 912, 97 S. Ct. 2981, 53 L. Ed. 2d 1097 (1977); *United States* v. *Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (no reasonable expectation of privacy that would prevent officer's watching and listening to defendant from common hallway); *United States* v. *Cruz Pagan*, 537 F.2d 554, 557–58 (1st Cir. 1976) (no reasonable expectation of privacy that would preclude officer's entry into underground shared garage); *United States* v. *Bain*, 155 F. Supp. 3d 107, 117 (D. Mass. 2015) (no reasonable expectation of privacy that would preclude officers from entering common hallways, which "served as passageways routinely used for egress and ingress to the apartment units," and defendant "could not exclude others from or control access to these areas" or "reasonably expect that the goings-on in [these areas] would remain secret" [internal quotation marks omitted]); *United States* v. *Broadway*, 580 F. Supp. 2d 1179, 1188, 1193–94 (D. Colo. 2008) (no expectation of privacy that would prevent officer from entering common hallway after authorization by groundskeeper with apparent authority); *United States* v. *Romano*, 388 F. Supp. 101, 104–105 (E.D. Pa. 1975) (no reasonable expectation of privacy in drainpipe at rear of town-house).

[13] Several Connecticut cases support essentially the same proposition. See, e.g., *State* v. *Pierre*, 139 Conn. App. 116, 118–19, 128–29, 54 A.3d 1060 (2012) (seizure of gun in open attic space attached to common hallway of rooming house was lawful because defendant had no reasonable expectation of privacy in common hallway or attic), aff'd, 311 Conn. 507, 88 A.3d 489 (2014); *State* v. *Alexander*, 115 Conn. App. 1, 4, 8–9, 972 A.2d 252 (no expectation of privacy in common hallway of two-family house when police officer entered unlocked door and knocked on defendant's apartment door), cert. denied, 293 Conn. 920, 979 A.2d 491 (2009); *State* v. *Torres*, 36 Conn. App. 488, 498–500, 651 A.2d 1327 (no reasonable expectation of privacy in common areas of multitenant building when police legally entered common areas and conducted visual surveillance of defendant), cert. denied, 232 Conn. 912, 654 A.2d 357 (1995); but cf. *State* v. *Reddick*, 207 Conn. 323, 332–34, 541 A.2d 1209 (1988) (defendant did have reasonable expectation of privacy in common basement in two-family home when basement was

not readily accessible to outsiders).

[14] The state further asserts that the rationale of the court in *Caballes*—which was decided after *Kyllo*—did not implicate the location of the canine sniff and alert; if it did, the state maintains, the court in *Caballes* "would have simply disregarded or distinguished *Kyllo* on the basis that the *Kyllo* search was of a home." (Internal quotation marks omitted.)

[15] For purposes of this appeal, we assume that drug sniffing dogs are adequately precise such that they do not yield anything more than de minimus rates of error. But see *Illinois* v. *Caballes*, supra, 543 U.S. 411 (Souter, J., dissenting) ("[t]he infallible dog . . . is a creature of legal fiction").

[16] Hereinafter, all references in this opinion to *Jardines* are to the United States Supreme Court's decision in *Florida* v. *Jardines*, supra, 133 S. Ct. 1409.

[17] The state also refers us to *People* v. *Jones*, 279 Mich. App. 86, 93, 755 N.W.2d 224 (2008), appeal denied, 485 Mich. 1040, 776 N.W.2d 902 (2010), in which the Michigan Appellate Court concluded that a canine sniff of the porch of a house—apparently a freestanding, single-family residence—was not a search under the federal constitution. Id., 94–95. Following *Jardines*, however, *Jones* is no longer good law.

[18] The United States District Court for the District of Massachusetts, considering itself bound by squarely applicable First Circuit precedent, similarly concluded that the area in front of an apartment door in a multiunit building "was not a separate area . . . subject to [the tenant's] exclusive control and thus [did] not constitute curtilage." (Internal quotation marks omitted.) *United States* v. *Bain*, 155 F. Supp. 3d 107, 120 (D. Mass. 2015). The court in *Bain* noted, however, that "[a] number of persuasive considerations weigh in favor of applying the concept of curtilage in the apartment context generally and in this case in particular." Id., 118–19. Specifically, after analyzing the relevant factors identified by the United States Supreme Court in *United States* v. *Dunn*, supra, 480 U.S. 301, the District Court determined that the "area surrounding the door" of the apartment in question was in "immediate proximity to the home," it was part of the "larger enclosure" of the locked building, it "might have [been] used . . . as an extension of the home similar to a front porch," and "residents took steps to protect the area from the general public, by keeping the outer door . . . locked." *United States* v. *Bain*, supra, 119–20.

[19] We note that, in *State* v. *Williams*, 862 N.W.2d 831, 832, 838 (N.D. 2015), the North Dakota Supreme Court recently reaffirmed its reasoning and holding in *Nguyen*, concluding that the defendant, Andrew Robert Williams, the owner of a condominium in a four unit condominium building, could not prevail on his claim that the state violated his fourth amendment rights by conducting a warrantless canine sniff from the common hallway of the building and immediately outside the door to Williams' unit. As in *Nguyen*, the court in *Williams* determined that the common hallway was not curtilage and that Williams had no reasonable expectation of privacy in the area from which the search was conducted. Id., 837–38; see also *State* v. *Foncette*, 238 Ariz. 42, 45–46, 356 P.3d 328 (App. 2015) (although defendant, hotel guest, was entitled to constitutional protection against unreasonable searches and seizures that infringed on his expectation of privacy within his room, he had no reasonable expectation of privacy in hallway outside his room from where dog sniff, which could reveal only contraband, was conducted, and defendant also lacked reasonable expectation of privacy in drugs found in his room following dog's alert in front of his hotel door, because any interest that he had in possessing contraband was not deemed legitimate by society).

[20] We also agree with the Seventh Circuit that, as a matter of policy, "[d]istinguishing *Jardines* based on the differences between the front porch of a stand-alone house and the closed hallways of an apartment building draws arbitrary lines." *United States* v. *Whitaker*, supra, 820 F.3d 854. "First, there is the middle ground between traditional apartment buildings and [single-family] houses. How would courts treat a split-level duplex? Perhaps even one that had been converted from a house into apartments? Does the number of units in the building matter, or do all [multiunit] buildings lack the protection *Jardines* gives to single-family buildings? And what about garden apartments whose doors, like houses, open directly to the outdoors?" Id.

[21] As we have indicated; see footnote 4 of this opinion; the state does not contend that a lesser standard than probable cause applies to the canine sniff that we have identified as a search for purposes of article first, § 7.

[22] See, e.g., *State* v. *Zidel*, 156 N.H. 684, 686, 940 A.2d 255 (2008) (addressing federal constitutional claim before state constitutional claim because issue was definitively settled under federal constitution).

[23] Of course, whether the federal constitution definitively resolves the claim in the defendant's favor must be determined on a case-by-case basis. To conclude that it does in any given case, we must be able to say with a high degree of confidence that the United States Supreme Court, if presented with the federal constitutional claim, would decide it in favor of the defendant.

[24] Although Justice Zarella agrees with this approach—that is, deciding constitutional claims under the state constitution when the issue has not been truly settled under the federal constitution—he nevertheless proceeds to explain why we should adopt the so-called "interstitial approach" to state constitutional adjudication and reject the so-called "primacy" approach. As Justice Zarella explains, under the interstitial approach, a court turns first to the federal constitutional claim, and only if the defendant cannot prevail on that claim does the court then consider the claim under the state constitution. Under the primacy approach, a court looks first to the state constitution and resorts to the federal constitution only if the defendant's state constitutional claim is unavailing. It is unclear to us why Justice Zarella advocates an interstitial approach even as he accepts the premise that a state constitutional claim is properly decided first when the federal constitutional issue remains unsettled. In any event, in our view, it is most sensible and practical simply to decide the constitutional claim under the federal constitution if the law thereunder is truly settled and the defendant prevails; if the law is not settled under the federal constitution, or if it is settled but in favor of the state, we then look first to the state constitution.

[25] Of course, there are other sound reasons to decide state constitutional issues first unless the issue is truly settled under the federal constitution; see, e.g., 1 J. Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses (4th Ed. 2006) §§ 1.01 [2] through 1.04, pp. 1-4 through 1-28; W. Horton, The Connecticut State Constitution (2d Ed. 2012) pp. 36–37; D. Braithwaite, supra, 33 Rutgers L.J. 32–47; J. Landau, "Some Thoughts About State Constitutional Interpretation," 115 Penn. St. L. Rev. 837, 845–46 (2011); perhaps most significantly, the importance of ensuring that our state constitution is appropriately recognized as a source of rights that are both separate from and independent of, and sometimes greater than, the rights afforded under the federal constitution.

[26] Indeed, in her dissenting opinion, Justice Espinosa not only disagrees that the federal constitutional issue presented by this appeal is settled in favor of the defendant, but she suggests that *Thomas* was wrongly decided and concludes that the defendant *cannot* prevail under the federal constitution.

[27] Numerous state courts have also rejected *Thomas* and noted that it has been the subject of recurring criticism. See, e.g., *Nelson* v. *State*, 867 So. 2d 534, 536–37 (Fla. App. 2004), review denied, 115 So. 3d 1001 (Fla. 2013); *Hoop* v. *State*, supra, 909 N.E.2d 467; *Fitzgerald* v. *State*, 153 Md. App. 601, 675–76, 837 A.2d 989 (2003), aff'd, 384 Md. 484, 864 A.2d 1006 (2004); *People* v. *Jones*, 279 Mich. App. 86, 93 n.3, 755 N.W.2d 224 (2008), appeal denied, 485 Mich. 1040, 776 N.W.2d 902 (2010); *State* v. *Washburn*, 201 N.C. App. 93, 99, 685 S.E.2d 555 (2009), review denied, 363 N.C. 811, 692 S.E.2d 876 (2010); *State* v. *Smith*, 327 Or. 366, 375, 963 P.2d 462 (1998).

[28] In fact, Justice Zarella acknowledges that Justice Espinosa, in her dissent, "has raised significant distinctions" between the issue presented in this case and the related issues decided by the United States Supreme Court in other cases. It is in large measure because of these "significant distinctions" that we cannot fairly say that the issue is truly settled under the federal constitution.

[29] We acknowledge that, generally, Second Circuit precedent presumptively carries particular weight with this court when we are *deciding* an issue of federal law. E.g., *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 475, 881 A.2d 259 (2005) (decisions of Second Circuit Court of Appeals " 'carry particularly persuasive weight' " in our interpretation of federal law). Contrary to Justice Zarella's assertion, however, this general principle has no applicability with respect to the threshold, and entirely separate, determination of *whether* to decide a claim first under the federal constitution or first under the state constitution. While there are sound reasons to give particular weight to the Second Circuit's interpretation of federal law when we are resolving a claim under federal law—most significantly, to avoid the situation in which a litigant would prevail on the identical federal claim in one jurisdiction but not in the other—no such consideration has any bearing on which constitutional claim should be decided first. This point—that a holding of the Second Circuit should not dictate the order in which we

address claims raised under both the federal and state constitutions—may be illustrated as follows. If we address the state constitutional claim first and decide it in favor of the defendant, there is no reason to address the federal constitutional claim; for purposes of that case, the defendant is entitled to prevail under the state constitution, and it simply does not matter which way the claim would have been decided under the federal constitution. If we decide the state constitutional claim first, but the state prevails, we then must turn to the federal constitution to determine whether it affords greater protection to the defendant than the state constitution. In neither case is there any possibility that the very same claim would be decided differently under the same law because the defendant's two separate and distinct claims implicate two different constitutions.

We also disagree with Justice Zarella that an issue of federal constitutional interpretation is settled solely because the Second Circuit has decided it in a certain way. Because the United States Supreme Court is the final arbiter of the meaning and scope of the federal constitution, we cannot reasonably characterize a federal constitutional issue as settled unless we can confidently predict how the United States Supreme Court would resolve it. If we are unable to do so—and, as we explain more fully hereinafter, we certainly cannot make such a prediction in the present case—there simply is no persuasive reason to address the issue first under the federal constitution. Consequently, there is no justification for this court to entertain the fiction, advocated by Justice Zarella, that a federal constitutional question is settled merely because it is settled in the Second Circuit. Ironically, because Justice Zarella acknowledges that we do not blindly follow Second Circuit precedent, if we were to adopt his approach and first address any issue of federal constitutional interpretation that has been resolved by the Second Circuit, we would be creating the very problem that Justice Zarella seeks to avoid, namely, the possibility that this court would disagree with the Second Circuit's interpretation of a federal constitutional provision.

[30] With respect to his repudiation of Justice Kagan's reliance on the privacy based rationale to support her determination that the conduct of the police in *Jardines* violated the fourth amendment, Justice Alito explained that he saw "no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand." *Florida* v. *Jardines*, supra, 133 S. Ct. 1424 (Alito, J., dissenting).